844 So.2d 792 (2003)
Nicholas PASSALACQUA, individually, Matt Sechter, individually, E-mail Analytics.Com, Inc., a Florida corporation, Appellants,
v.
NAVIANT, INC., a Florida corporation, f/k/a E-Direct, Inc., Appellee.
No. 4D02-2285.
District Court of Appeal of Florida, Fourth District.
May 14, 2003.
*793 Clifford J. Hunt of Law Office of Clifford J. Hunt, P.A., Clearwater, for appellants.
P. Benjamin Zuckerman of Ritter Chusid Bivona & Cohen, LLP, Boca Raton, for appellee.
STERN, KENNETH D., Associate Judge.
This is an appeal from a non-final order of the circuit court, granting a temporary injunction to enforce a non-compete agreement. For the reasons set forth below, we reverse and remand.

Background
Appellants, Nicholas Passalacqua ("Passalacqua") and Matt Sechter ("Sechter"), had both known each other in their prior vocation as telemarketing "cold callers," making unsolicited sales calls to sell securities. Both had held various jobs, always in the securities industry.
Appellee, Naviant, Inc. ("Naviant"), was founded in 1999 by one Scott Hirsch ("Hirsch"). The company is one of scores of businesses that provide "opt-in e-mail marketing services," which in essence involve offering to other companies services for marketing their products and services on the Internet. It is undisputed that Naviant has become a very large company, highly significant, if not dominant, among a large number of such companies.
This case essentially involves a dispute between Naviant's claim that its quick rise to prominence is due to its unique concepts and techniques, and Appellants' claim that Naviant's rise is due solely to its aggressive, high volume marketing, without the use of any novel ideas or methods.
Passalacqua applied for a job with Naviant, using as a reference Sechter, who was not then known to Naviant. Upon being hired by Naviant, Passalacqua signed a non-compete agreement. Passalacqua was hired in early January, 2002, and quit his employ after about three weeks, on January 30, 2002. Passalacqua told Naviant's CEO, Hirsch, that he did not think he could make enough money at Naviant and that he wanted to start his own business in the opt-in e-mail marketing industry. Hirsch responded that they would enforce their nondisclosure and non-compete agreement.
Sechter thereafter applied for a position at Naviant. He was hired and began to work there on February 25, 2002. On the day Sechter began to work at Naviant, *794 Passalacqua joined another man to form Appellant E-Mail Analytics, Inc. ("E-Mail Analytics"), to provide opt-in e-mail services. Eighteen days after being hired at Naviant, Sechter, too, resigned. Shortly thereafter, he joined E-Mail Analytics, and bought out the ownership interest of Passalacqua, who continued to work there.
The Confidentiality Agreement ("the Agreement") which both Passalacqua and Sechter executed, defines "confidential information," in pertinent part, as including any information or material "in which there is a proprietary interest and that [sic] there is a legitimate business reason for guarding against unauthorized use or disclosure." There is a category of "subject information," defined as "any Confidential Information, Trade Secret(s) or other proprietary information provided by one party to the other whether orally or in writing or stored on any form of Medium." "Trade secrets" are defined, in pertinent part, as involving information or material "that (i) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." There is the customary, boilerplate language asserting that "[t]he [employee] acknowledges that irreparable injury and damage will result from disclosure to third parties, or utilization for purposes other than those connected with the proposed Venture or other business relationship, of the Confidential Information."
The Agreement excludes certain material, including, in pertinent part, "any such Confidential Information that [the employee] can establish: (a) has become generally known or available to the public without breach of this Agreement by the [employee]; (b) was known by the [employee] before receiving such information from the Corporation; [or] (c) has become known by or available to [the employee] from a source other than Corporation, without any breach of any obligation of confidentiality owed to Corporation, subsequent to disclosure of such information to it by Corporation...."
Finally, the Agreement provides that, in consideration for compensation from the Corporation, the employee applicant covenants that s/he "will not, for a period of two (2) years after the end or termination of individual's relationship with Corporation, irrespective of the time, manner or cause of such termination, ... engage in a business in the continental United States that is the same or similar to the [business of the company]." The parties agree that, in the event of a breach of the agreement by the employee, "Corporation shall be entitled, in addition to any other remedies and damages available at law, to an injunction to restrain the violation by [the employee], his/her/its partners, agents, servants, employers, employees and all persons acting for or with him/her/it."
On April 19, 2002, Naviant filed suit, seeking injunctive relief, an accounting and damages, and a temporary injunction against Passalacqua, Sechter and E-Mail Analytics. An adversarial evidentiary hearing was held on May 10, 2002. The trial court made no findings of fact from the bench during or following the hearing. Its sole findings of fact are those statements contained in the temporary injunction issued four days later which prohibited appellants from engaging in competition with appellee Naviant in the opt-in e-mail marketing business and from revealing or disclosing any confidential information they received from Naviant. The temporary injunction lacks any specific findings that Appellants have obtained, much less *795 used, any trade secrets or any extraordinary or specialized training from Naviant.

The Law Regarding Enforcement of Restrictive Covenants
Of central importance to this appeal is the following language of the controlling statute, section 542.335(1)(b), Florida Statutes (2002):
(b) The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant. The term "legitimate business interest" includes, but is not limited to:
1. Trade secrets, as defined in s. 688.002(4).
2. Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
3. Substantial relationships with specific prospective or existing customers, patients, or clients.
4. Customer, patient, or client goodwill associated with:
a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";
b. A specific geographic location; or
c. A specific marketing or trade area.
5. Extraordinary or specialized training.
Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable.
Even before the statute[1] contained its present expansive list of the types of information which could constitute a "legitimate business interest," the courts recognized the essence of the concept. In the landmark Florida case of Hapney v. Cent. Garage, Inc., 579 So.2d 127 (Fla. 2d DCA 1991), the court noted that "[g]enerally, three such interests were generally recognized: (1) trade secrets and confidential business lists, records, and information; (2) customer goodwill, and (3) to a limited degree, extraordinary or specialized training provided by the employer." Id. at 131 (citations omitted).
The Hapney court quoted with approval the Tennessee Supreme Court's statement of the essential rationale underlying the concept of a "legitimate business interest":
[A]ny competition by a former employee may well injure the business of the employer. An employer, however, cannot by contract restrain ordinary competition. In order for an employer to be entitled to protection, there must be special facts present over and above ordinary competition. These special facts must be such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer.
Id. at 130 (quoting Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 473 (Tenn.1984)) (citations omitted; emphasis supplied).

Plaintiff /Appellee Naviant Failed to Demonstrate a "Legitimate Business Interest"
The record of the hearing in this case contains nothing constituting proof of any "legitimate business interest," as defined in the statute, or of any other proprietary or confidential interest of Naviant, being violated or otherwise affected by appellants' competing with appellee. On the contrary, appellee's presentation at the hearing consists of rank supposition by the sole witness to testify on behalf of Naviant, CEO Hirsch. Although the Verified Complaint and the Motion for Temporary Injunction *796 contain allegations that appellants misappropriated Naviant's customer data and solicited its customers, not one such customer was named in the complaint, the motion or any exhibits filed. Hirsch could not identify a single customer of Naviant that had been approached by appellees. Moreover, he was unable to describe any confidential data base or other customer-related material that appellees had appropriated or used. In fact, Hirsch conceded that new employees are not given names of any existing customers, but are given sales leads which Naviant had obtained through commercial sources; he also conceded that, while employed with Naviant, Passalacqua and Sechter had no contact with any of Naviant's customers.
Naviant's claim that Passalacqua and Sechter were making use of a legitimate business interest of Naviant consisted essentially of its claim, through the testimony of CEO Hirsch, that, since its founding in 1998, Naviant had developed a wholly unique methodology which enabled it to capture a large percentage of the market. Appellants do not dispute Naviant's claims of success in the marketplace, but vigorously dispute its claim to a unique methodology. The record shows that Hirsch's testimony during the evidentiary hearing on the temporary injunction lacks any showing of a unique system or method of attracting or doing business. Hirsch claims that Naviant uses a sales manual which presents a very unique sales presentation for soliciting business from companies, and other unique items as well. The manual, Hirsch said, explains how to make a cold call, how to make a second call, and gives closing techniques. He testified that neither Passalacqua nor Sechter returned his manual before leaving, but admitted on cross-examination that no one saw either of them remove a manual.
Hirsch did not articulate how any activity, method or technique utilized by Naviant was unique or proprietary in any way. Nor did he give any reason to believe that the manual was anything but a compilation of widely known and commonly used sales and marketing techniques. Naviant failed to prove, through Hirsch or otherwise, anything which even approximates a "legitimate business interest" as defined in the statute, section 542.335(1)(b), Florida Statutes.

Appellants Demonstrated the Apparent Absence of "Legitimate Business Interests"
Even if Naviant had made the statutorily-requisite prima facie case for the existence of a "legitimate business interest," the presumption of irreparable harm which thereby would have been raised under section 542.335(1)(j) is rebuttable, not conclusive. Don King Prods., Inc. v. Chavez, 717 So.2d 1094, 1095 (Fla. 4th DCA 1998). Although not required to disprove Naviant's conclusory and unsubstantiated claims of proprietary information, appellants presented detailed and uncontroverted testimony and other evidence showing that there was nothing unique about Naviant's operations, sales methods or other aspects of its business that anyone with their history of making unsolicited sales calls ("cold calling") does not know.
The unrebutted testimony of Passalacqua and Sechter thoroughly described material and methods that are generic and not proprietary. They insisted that Naviant's training book contained nothing that is not generally available, being little more than sales scripts which were nearly identical to those used in the business of soliciting securities sales through cold calling. They denied Hirsch's claim that Naviant has a two-week training program. Sechter claimed he was at Naviant only an hour and a half on his first day, before he was *797 given a desk and a computer and told to "get to work." He initially generated leads by "surfing the Internet." He testified that the "training" he received lasted two to three hours on each of two consecutive days during his first week there; he was told to review the manual and review other opt-in e-mail companies' information. Sechter stated that on Monday of his second week on the job, he was "trained" to use Outlook Express software, which he had been using in securities sales for several years. He testified that the sales tactics used by Naviant were generic: "It's the same sales tactics in every business."
Hirsch and Sechter testified that E-Mail Analytics is developing its own database, which takes a long time. There was no proprietary database which they could have taken from Naviant. E-mail Analytics formed a partnership with another company, Future.Net, which provided a substantial amount of data. Sechter daily visits many websites on the Internet to keep abreast of trends in the industry, and to obtain both new data and new ideas. He readily concedes that E-mail Analytics has nowhere near the quantity of marketing data that Naviant has. The information provided to him by Naviant involved the same basic information and even the same marketing glossary of terms, and the same methods of obtaining data, running the business, and building customer relations, as are used by other opt-in companies. He knows this from having retrieved this information from the Internet. Sechter introduced evidence of the very high number of e-mail companies, gleaned from the Internet. He claimed that he received 1,140,000 entries when he searched the phrase "opt-in e-mail marketing." He introduced at the hearing a computer printout containing a long list of such companies; the first three were in Delray Beach, Boca Raton, and Ft. Lauderdale, all within the immediate area where Naviant's offices are located.
Appellant Passalacqua also testified. He has a stockbroker background similar to Sechter's. He had used the Red Book to obtain leads as a securities broker. He also has visited many opt-in e-mail sites on the Internet. As had Sechter, Passalacqua denied ever seeing, much less downloading or using, Naviant's customer list. As to the sales scripts and rebuttals used by Naviant, Passalacqua says that the material "was written years ago by a bunch of stock brokers," and is in common use in the securities industry.

Conclusion
Thus, the record lacks the showing required of the Plaintiff/Appellee, and contains much to suggest that that showing cannot be made. Accordingly, the Order Granting Temporary Injunction is hereby reversed, and this case is remanded to the trial court with instructions to vacate said order forthwith, without prejudice to the court's right to conduct further hearings with regard to a temporary injunction, should the court deem it appropriate.
STONE and GROSS, JJ., concur.
NOTES
[1] More particularly, the predecessor statute, section 542.33, Florida Statutes (1989).