[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14217

_____

VITAL PHARMACEUTICALS, INC.,
a Florida corporation d.b.a.
VPX Sports/Redline/Bang Energy,

                                  Plaintiff-Appellee-Cross Appellant,

*versus*

CHRISTOPHER ALFIERI,
an individual,
ANDREW LAROCCA,
an individual,
ELEGANCE BRANDS, INC.,
a Delaware corporation,

                                  Defendants-Cross Appellees,

2                    Opinion of the Court                    20-14217

ADAM PERRY,
an individual,

                                                    Defendant,

AMY MAROS,
an individual,

                                Defendant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-61307-AHS

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and ANDERSON, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal and cross-appeal involve the partial grant and partial denial of a motion for a preliminary injunction to enforce several restrictive covenants against the former employees of a producer of energy drinks. One former employee argues on appeal that she should not have been enjoined. The producer argues on

cross-appeal that the district court should have enjoined additional former employees.

Many, but not all, of the restrictive covenants—and the corresponding provisions in the preliminary injunction—have expired. So, we dismiss as moot the portions of the former employee's appeal that challenge the expired provisions. We also dismiss as moot the entire cross-appeal, which concerns only the expired covenants. But we have jurisdiction over—and reach the merits of—the former employee's appeal from the unexpired provisions in the preliminary injunction. And we vacate those provisions because the producer failed to prove its entitlement to preliminary relief.

## I. BACKGROUND

Vital Pharmaceuticals, Inc., a Florida corporation, produces and sells energy-drink products under the brand name "BANG." It views itself as a competitor of "[c]ompanies such as . . . Red Bull, Rock Star[,] and Monster Energy." And it considers itself "a recognized leader in the energy drink and sports nutrition markets."

In 2019, Vital made four hires relevant here. It hired Christopher Alfieri as vice-president of sales and distribution. It hired Adam Perry as director of sales and distribution. It hired Andrew LaRocca as director of distribution strategy. And it hired Amy Maros as senior supply chain manager.

When they accepted the job offers, these individuals signed employment agreements containing three restrictive covenants.

They agreed not to work for "a [c]ompeting [c]ompany" "[d]uring the term of [their] employment with [Vital] . . . and for a period of one . . . year from [their] termination or cessation date." They agreed not to solicit Vital employees to join a competing company, a provision that was also valid for one year from termination. And they agreed "never to disclose" or "to utilize for [their] own benefit, or for any third party's benefit" any of Vital's confidential information, including its product formulae and its marketing and sales information.

The new hires did not remain at the company for long. Vital terminated Alfieri in March 2020 when its business plans changed. Alfieri then joined Elegance Brands, Inc., a Delaware corporation, as its chief revenue officer. Elegance principally sells alcoholic beverages, but in 2019 it developed a cannabidiol-infused caffeinated drink called "Gorilla Hemp." LaRocca and Perry left Vital in May 2020 and accepted jobs with Elegance. Maros resigned from Vital effective June 17, 2020, but it appears that she began working for Elegance in early June.

Vital sued Alfieri, LaRocca, Maros, Perry, and Elegance. It alleged that the individuals violated their non-compete covenants by working for Elegance within a year after leaving Vital; that Alfieri violated the employee non-solicitation covenant by encouraging LaRocca, Maros, and Perry to join Elegance; and that Elegance and Alfieri engaged in tortious interference with Vital's contractual relationships with the other former employees. Vital sought injunctive relief and damages.

Vital then moved for a preliminary injunction. It asked the district court to enjoin its former employees from violating their non-compete covenants by working for Elegance or another competitor during the one-year term of those covenants, "as such period may be extended due to tolling." It also sought to enforce Alfieri's employee non-solicitation covenant. And it asked that Elegance be enjoined from interfering with the former employees' restrictive covenants and from using any confidential information belonging to Vital. Perry settled with Vital before the district court ruled on the motion.

After a two-day evidentiary hearing, the district court granted the motion in part. It first determined that the restrictive covenants were valid and enforceable under Florida law. *See* FLA. STAT. § 542.335. Specifically, it concluded that the covenants were justified by Vital's "legitimate business interests" in its product formulae, in its other confidential information, and in its customer relationships. *See id.* § 542.335(1)(b). And it rejected the argument that Vital was required to "identify *specific* customers" to establish a legitimate business interest in its customer relationships.

The district court then concluded that Vital "ha[d] shown a substantial likelihood of succeeding on its claims against Maros . . . but not [against] Alfieri or LaRocca." It explained that Vital had "presented . . . more than sufficient evidence . . . that Maros ha[d] breached the [agreement] she signed" because the evidence established that "Maros accepted a position at Elegance while still employed [by] and collecting [a] salary from [Vital]." And it reasoned

that it could infer a likelihood of success from the breach of the restrictive covenant. But, crediting the testimony of Elegance's chief executive officer, the district court found that "there [was] absolutely no evidence that Alfieri or LaRocca took any information with them from [Vital] to Elegance" or that Elegance had seen any of Vital's confidential information. So, Vital could not "make a prima facie showing that Alfieri or LaRocca breached their [agreements]."

The district court also determined that Vital had satisfied the other elements necessary to secure a preliminary injunction against Maros. Under Florida law, the district court explained, Vital was entitled to a "presumption of irreparable injury" because it had proved "[t]he violation of an enforceable restrictive covenant," *id.* § 542.335(1)(j), and Maros had not rebutted the presumption. The balancing of harms favored Vital because the district court was unable to "consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." *See id.* § 542.335(1)(g)(1). The public interest favored the enforcement of the restrictive covenants. And Maros's defenses to enforcement failed.

The preliminary injunction contained five operative provisions. First, Maros was "enjoined for a period of twelve . . . months," "calculated from" the date Vital posted a bond, "from working for Elegance" or other competitors of Vital. Second, Elegance was also prohibited during the same period from employing Maros or using any of Vital's confidential information. Third,

Maros was "further enjoined from working for any other competitor" and from soliciting Vital employees "for a period of twelve[ ]months as set forth in the [employment] [a]greement," to be "tolled until the date that Maros and Elegance c[a]me into compliance with the non-competition restriction of the agreement." Fourth, although the district court had suggested in its opinion that Alfieri and LaRocca would not be enjoined, it prohibited the two men, along with Maros, from soliciting "current [Vital] energy drink customer[s] or prospective customers about whom [they] had" confidential information belonging to Vital. Finally, it stated that the three individuals "shall not use, permit to be used, disclose, or transmit for any purpose any of [Vital's] [c]onfidential and [p]roprietary information."

Vital posted a bond on October 16, 2020. Maros timely appealed the preliminary injunction against her. *See* 28 U.S.C. § 1292(a)(1). And Vital timely cross-appealed the partial denial of preliminary injunctive relief against Alfieri and LaRocca. *See id.*

Vital moved to supplement the record on appeal. Vital asked this Court to take notice that "Alfieri and LaRocca were terminated [by Elegance] on October 12, 2020, and Maros was terminated on October 16, 2020." We carried the motion with the case.

In the light of this new information, we directed the parties to file supplemental briefs explaining when and whether the one-year-long provisions in the employment agreements and preliminary injunction had expired. We also directed the parties to discuss whether any aspect of the appeal or cross-appeal was moot. The

parties agreed that the two time-limited provisions in the preliminary injunction had expired, and that the prohibition against using Vital's confidential information had not expired because there was no applicable time limit. But Maros argued that her appeal was not moot. And Vital argued the same as to its cross-appeal.

## II. STANDARDS OF REVIEW

Two standards govern our review. "We review *de novo* questions of our jurisdiction." *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019). And we review for abuse of discretion a ruling on a motion for a preliminary injunction. *See Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 773 (11th Cir. 2015). "A district court abuses its discretion if it applies an incorrect legal standard . . . or makes findings of fact that are clearly erroneous." *Id.* at 773–74 (internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion in two parts. We first explain why the appeal is partially moot and the cross-appeal is moot in its entirety. We then explain why the district court abused its discretion when it entered the unexpired portions of the preliminary injunction against Maros.

Before addressing these issues, we grant the motion to supplement the record. "Although we generally do not consider evidence that the parties did not submit in the district court, we have the power to do so" in exceptional circumstances. *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006).

Because the supplemental material contains facts that "illuminate the mootness issue," *id.* at 1171, we conclude that supplementation of the record is appropriate here.

### A.  The Appeal is Partially Moot and the Cross-Appeal is Completely Moot.

We turn first, as we must, to our own jurisdiction. *See Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1296 (11th Cir. 2016) ("[W]e are obliged first to consider our power to entertain the claim."). The constitutional command that the federal judiciary hear only "Cases" and "Controversies," *see* U.S. CONST. art. III, § 2, applies with as much force to courts of appeals as it does district courts, *see Amodeo*, 916 F.3d at 971. And because a case or controversy "must exist throughout all stages of litigation," *id.* (internal quotation marks omitted), we must ensure—up until the moment our mandate issues—that intervening events have not mooted the appeal by preventing us from "grant[ing] any effectual relief whatever in favor of the appellant," *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) (internal quotation marks omitted); *see also Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1119 (11th Cir. 1995) ("An appellate court simply does not have jurisdiction under Article III to decide questions which have become moot by reason of intervening events." (internal quotation marks omitted)); *Key Enters. of Del., Inc. v. Venice Hosp.*, 9 F.3d 893, 899 (11th Cir. 1993) (en banc) (dismissing an appeal "[b]ecause the case became moot after the panel published its decision but before the mandate issued").

"One such intervening event is the expiration of a preliminary injunction that is being challenged in an interlocutory appeal." *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1228–29. "If the preliminary injunction has expired, it no longer has legal effect on the parties, and a decision by this court affirming or vacating the defunct injunction cannot affect the rights of the litigants." *Id.* at 1229 (alteration adopted) (internal quotation marks omitted). Similarly, we have "consistently held that the appeal of a preliminary injunction is moot where the effective time period of the injunction has passed." *Brooks*, 59 F.3d at 1119. And an appeal from the denial of a preliminary injunction is moot if "the end-date of the requested injunction," *id.*, has come and gone before the court of appeals issues its mandate.

Maros's appeal is moot to the extent it challenges the portions of the preliminary injunction prohibiting her from working for Vital's competitors or soliciting Vital's employees. The twelve-month prohibition against working for competitors began on October 16, 2020, when Vital posted bond, and ended a year later. And the prohibition against soliciting Vital's employees also expired October 16, 2021, a year after "Maros and Elegance c[a]me into compliance with the . . . agreement" through Elegance's termination of Maros.

Maros's efforts to save those portions of her appeal from mootness are unavailing. She argues that "[t]he injunction bond undercuts the notion that" those portions of the appeal are moot. But "any issue preserved by [that] bond . . . must be resolved in a

trial on the merits," not "on appeal of [the] preliminary injunction." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981). She also contends that "the [d]istrict [c]ourt may afford law-of-the-case status to its prior clear legal conclusions reached at the preliminary injunction stage." But, as the district court acknowledged in its order, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* at 395. And although Maros is correct that we may review "disputes that are capable of repetition, yet evading review" as an "exception to the mootness doctrine," *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229 (internal quotation marks omitted), the moot issues here are not capable of repetition. Because the non-compete and employee non-solicitation covenants in Maros's employment agreement have already expired, there is no "reasonable expectation or a demonstrated probability" that Vital will seek or obtain another preliminary injunction to enforce those covenants. *Id.* (internal quotation marks omitted).

By contrast, Maros's appeal is not moot to the extent it challenges the portions of the preliminary injunction relating to solicitation of Vital's customers and the disclosure of confidential information. Those portions of the injunction—like the non-disclosure provisions they enforce—have no end date. So, neither the non-disclosure covenant nor the corresponding portions of the preliminary injunction have expired.

Vital's cross-appeal of the partial denial of preliminary injunctive relief against Alfieri and LaRocca is moot in its entirety.

To be sure, the employment agreements toll the duration of the twelve-month-long non-compete and employee non-solicitation covenants for as long as "the [e]mployee is found to have been in violation of such restriction[s]." But it is undisputed that the men were terminated from Elegance on October 12, 2020. And Vital concedes that "the record does not establish whether [the men have] been employed in violation of [their] restrictive covenant[s] since that date." On the current record, then, the twelve-month period of the non-compete and employee non-solicitation covenants in Alfieri's and LaRocca's agreements came to an end no later than October 2021. Because "the effective time period of the injunction has passed," the appeal of the partial denial of preliminary relief is moot. *Brooks*, 59 F.3d at 1119.

Vital argues that the cross-appeal "is not moot, because [Vital] is entitled to the benefit of its contractual agreement." That is, if Vital succeeded on its cross-appeal, "the one-year restrictive period" in Alfieri's and LaRocca's agreements "should begin after the Court issues its decision." In support, Vital relies on the holding of a Florida court that, "[w]here there has been a delay in the entry of a non-compete injunction . . . , the party seeking to enforce the non-compete clause is entitled to receive the benefit of its bargain, which is the enforcement of the full non-compete period specified in the agreement between the parties." *Anakarli Boutique, Inc. v. Ortiz*, 152 So. 3d 107, 109 (Fla. Dist. Ct. App. 2014).

We rejected the same argument in *Tropicana Products Sales, Inc. v. Phillips Brokerage Co.*, another appeal involving the

enforcement of a non-compete covenant under Florida law. 874 F.2d 1581, 1582 (11th Cir. 1989). We recited the general rule that "an appeal from the denial of a motion for [a] preliminary injunction is mooted when the requested effective end-date for the preliminary injunction has passed." *Id.* And we acknowledged that the employer "may have a substantive right under Florida law to an injunction of the length specified in [the restrictive covenant] to begin upon entry of final judgment if it prevails at a *trial on the merits*." *Id.* at 1583. But we held that this substantive right to a post-trial remedy did not alter our conclusion "that the denial of [the] *preliminary injunction* [was] . . . mooted by the passing of the specific end-date of the requested preliminary relief." *See id.*

We reach the same conclusion here. "[A] preliminary injunction is meant to keep the status quo for a merits decision, not to replace it." *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1225 (11th Cir. 2021). So, setting aside its potential entitlement to permanent relief, Vital is entitled at this stage to no more than its "requested preliminary relief," *Tropicana*, 874 F.2d at 1583—enforcement of the non-compete and employee non-solicitation covenants "during each such covenant's applicable restrictive period as such period may be extended due to tolling." Because there is no evidence that Alfieri or LaRocca violated those covenants after October 12, 2020, the twelve-month restrictive periods (including tolling) have, for purposes of this appeal, ended and the "effective end-date for the preliminary injunction has passed." *Id.* at 1582. The cross-appeal is moot.

To be clear, we hold only that the cross-appeal and portions of the appeal are moot. We do not hold that the entire case is moot. Vital's complaint requests money damages, and "[s]uch claims, if at all plausible, ensure a live controversy" in the district court. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019). Vital also asserts a right under Florida law to a permanent injunction enforcing the "full . . . period" of even the expired covenants, although we express no opinion as to whether Vital is entitled to that purported right.

## B. Vital Did Not Prove Its Entitlement to the Rest of the Preliminary Relief it Obtained Against Maros.

A party seeking "a preliminary injunction must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (internal quotation marks omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (internal quotation marks omitted).

When considering whether Vital has satisfied these requirements, we are guided by Florida law, "which contains a comprehensive framework for analyzing, evaluating and enforcing restrictive covenants contained in employment contracts." *Proudfoot*

*Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009) (internal quotation marks omitted). "For a restrictive covenant to be valid, 'the person seeking enforcement of the restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant.'" *Id.* at 1231 (alterations adopted) (quoting FLA. STAT. § 542.335(1)(b)). Florida law also provides that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." FLA. STAT. § 542.335(1)(j).

Of the four provisions in the preliminary injunction that operated against Maros, we have jurisdiction to review only two: the prohibitions against soliciting Vital's current or prospective "energy drink customers . . . about whom [Maros] had [Vital's] [c]onfidential and [p]roprietary information" and against using "for any purpose any of [Vital's] [c]onfidential and [p]roprietary information." These prohibitions give effect to the non-disclosure covenant in Maros's employment agreement. But because Vital never alleged a breach of that covenant, it is unclear why the district court considered the prohibitions warranted. And the district court abused its discretion by including the prohibitions in the preliminary injunction.

As an initial matter, Vital did not establish a legitimate business interest in its customer relationships. Florida law treats relationships with customers as legitimate business interests only when those relationships are "[s]ubstantial" and with "*specific*

prospective or existing customers." *Id.* § 542.335(1)(b)(3) (emphasis added). It follows from the statutory text that a party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party "plead[s] and prove[s]" the identity of *specific* customers and the substantiality of the relationship with those customers. *Id.* § 542.335(1)(b); *see also Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 117–18 (Fla. Dist. Ct. App. 2015) (holding that the record was "insufficient to support the trial court's finding of a substantial business relationship" because "the record d[id] not even contain enough information to meaningfully discuss the relationship"); *Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. Dist. Ct. App. 2003) (vacating a preliminary injunction predicated on the defendants' solicitation of the plaintiff's customers because "not one such customer was named in the complaint, the motion[,] or any exhibits filed"). Vital failed to name and prove a substantial relationship with specific clients. So, it cannot rely on its customer relationships to establish a legitimate business interest. And the district court abused its discretion when it held otherwise.

Even if we assume that some legitimate business interest exists, Vital did not prove that it would suffer irreparable injury unless Maros was enjoined from violating the non-disclosure covenant—the only covenant that could have justified the two prohibitions. Vital contends that the district court correctly applied the state-law rule that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury." FLA. STAT.

§ 542.335(1)(j). This contention raises a knotty choice-of-law question. *See Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991) (holding that "federal procedure," including "traditional federal equity practice," applies in diversity cases "to determine whether [a] preliminary injunction was properly issued"); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (explaining that presumptions of irreparable harm are "contrary to traditional [federal] equitable principles"). But we need not resolve that question here because Vital has not proved its entitlement to the statutory presumption in any event.

As the statutory language suggests, *see* FLA. STAT. § 542.335(1)(j), the presumption applies only to the "enforceable restrictive covenants that have been violated," *Medco Data, LLC v. Bailey*, 152 So. 3d 105, 106 (Fla. Dist. Ct. App. 2014); *cf. Proudfoot*, 576 F.3d at 1229, 1232 (treating non-compete, non-solicitation, and "client non-compete" provisions, and "a clause concerning confidential information" in the same agreement as four separate restrictive covenants and permitting a universal presumption of irreparable harm because the defendant "breached all four [r]estrictive [c]ovenants"). The district court found that Maros had violated the *non-compete* covenant by working for Elegance. But Vital did not plead in its complaint or argue in its motion for a preliminary injunction that Maros had breached the *non-disclosure* covenant by disclosing confidential information or soliciting Vital's clients about whom she held confidential information. Nor did the district court make findings to that effect. To the contrary, the district

court credited the "unequivocal" testimony of Elegance's chief executive officer that "Elegance has not seen and is not privy to any of [Vital's] allegedly confidential trade secret information." The district court abused its discretion when it applied the presumption of irreparable harm to the non-disclosure covenant.

Without the benefit of a presumption, Vital did not establish, as it was required to, that it was "likely to suffer irreparable harm in the absence of preliminary relief" prohibiting Maros from disclosing or using its confidential information. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In response to Maros's argument that Vital "could not identify any actually confidential and specific [Vital] information that is being or could be utilized by [her] . . . to unfairly compete," Vital asserts only that the rebuttable presumption relieved the company of this evidentiary obligation and that Maros has not rebutted that presumption. Vital has the same response to Maros's explanation—supported by the record—that confidential information about the prices Vital pays to its suppliers is of no use to Elegance because Vital "benefits from economies of scale . . . and has developed in-house capabilities that smaller drink companies, like Elegance, simply do not have." But again, Vital is not entitled to a presumption of irreparable harm with respect to the non-disclosure provision.

Vital also asserts that "[i]f competitors acquire[d] [its] protected information, they would gain an unfair competitive advantage in the market." But this asserted injury is "remote [and] speculative," not "actual and imminent." *See Siegel v. LePore*, 234

F.3d 1163, 1176 (11th Cir. 2000) (internal quotation marks omitted). As already explained, Vital did not plead or argue that Maros breached the non-disclosure provision. And the evidence established that much of this information would be of little use to Vital's smaller competitors. In short, Vital failed to prove that the prohibitions against violation of the non-disclosure provision were necessary to prevent irreparable harm.

## IV. CONCLUSION

We **GRANT** the motion to supplement the record. We **DISMISS AS MOOT** Vital's cross-appeal and the portions of Maros's appeal relating to the non-compete and employee non-solicitation provisions of the preliminary injunction. And we **VACATE** the portions of the injunction that prohibit Maros from soliciting Vital's clients and disclosing Vital's confidential information.

WILLIAM PRYOR, Chief Judge, concurring:

I write separately to address the "knotty choice-of-law question" that the panel opinion properly does not resolve. Panel Op. at 17. Florida law provides that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." FLA. STAT. § 542.335(1)(j). But, in federal court, presumptions of irreparable harm are ordinarily disfavored in the context of a preliminary injunction. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987) (rejecting a presumption of irreparable harm as "contrary to traditional equitable principles"); *Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) ("The plaintiff's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm." (internal quotation marks omitted)). The question is whether a federal court considering a motion for a preliminary injunction in a diversity case must apply the state-law presumption or follow federal equity practice.

Although "the answer is surprisingly evasive," David Crump, *The Twilight Zone of the* Erie *Doctrine: Is There Really a Different Choice of Equitable Remedies in the "Court A Block Away"?*, 1991 WIS. L. REV. 1233, 1242, the better case is that a federal court must apply the federal standard and not the Florida presumption. Traditionally, federal courts have applied uniform standards to the award of equitable relief, even in the face of contrary state rules. And the modern choice-of-law analysis for

2              WILLIAM PRYOR, C.J., concurring              20-14217

diversity cases—once described as a "muddled soup of inconsistent principles," *id.* at 1241—does not require the traditional approach to yield to the Florida rule.

Since the ratification of the Constitution, the scope of the federal "judicial Power" has "extend[ed] to all Cases, in Law and Equity, . . . between Citizens of different States." U.S. CONST. art. III, § 2. The first Congress gave "cognizance" to the newly created federal courts "of . . . suits of a civil nature at common law or in equity, where . . . the suit is between a citizen of the State where the suit is brought, and a citizen of another State." Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78. The first Congress also enacted rules governing proceedings in law and in equity, which were distinct legal systems at the time.

Federal courts first used state procedures for common-law proceedings. "[I]n suits at common law," Congress provided that "the forms of writs . . . and modes of process" were to be those "used or allowed in the supreme court[] of the" state in which the federal court sat. Process Act of 1789, ch. 21, § 2, 1 Stat. 93, 93. And "the laws of the several states . . . [were to] be regarded as rules of decision in trials at common law . . . in cases where they apply." Judiciary Act § 34.

By contrast, "Congress provided that 'the forms and modes of proceeding in suits of equity' would conform to the settled uses of courts of equity." *Guar. Tr. Co. v. York*, 326 U.S. 99, 104–05 (1945) (alteration adopted) (quoting Process Act of 1792, ch. 36, § 2, 1 Stat. 275, 276). That is, the procedure that applied to equitable

20-14217        WILLIAM PRYOR, C.J., concurring        3

remedies in federal court was "not limited by the chancery system adopted by any State," but instead conformed to "[t]he usages of the High Court of Chancery in England" at the time of the Founding. *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 563 (1851). And it became "settled doctrine . . . that the remedies in equity [were] to be administered, not according to the state practice, but according to the practice of courts of equity in the parent country." *Boyle v. Zacharie*, 31 U.S. (6 Pet.) 648, 658 (1832); *accord Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939).

"Consequently, a federal court could issue an injunction in a diversity case that would have been unavailable in state court, while denying injunctive relief that a state court would have granted." Michael T. Morley, *The Federal Equity Power*, 59 B.C. L. REV. 217, 238–39 (2018). Consider, for example, *Guffey v. Smith*, a diversity suit involving an Illinois lease. *See* 237 U.S. 101, 109, 114 (1915). There, the Supreme Court permitted the award of an injunction to a lessee whose lease contained a "clause giving the lessee an option to surrender [the lease]," even though the Illinois Supreme Court had held "that the presence of such a clause in the lease operates to prevent the lessee from . . . enforcing [the lease] in equity." *Id.* at 114. The Court explained that, "[b]y the legislation of Congress and repeated decisions of this court[,] it has long been settled that the remedies afforded . . . in the Federal courts, sitting as courts of equity, are not determined by local laws or rules of decision, but by general principles, rules[,] and usages of equity."

*Id.* The "common law of chancery" that developed to elucidate these general equitable principles, *Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) at 563, mirrored the "general principles of commercial law" that federal courts applied in diversity actions at law in the place of "the decisions of the [relevant] state tribunals," *see Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18 (1842); *Guar. Tr.*, 326 U.S. at 102–03 n.1 (explaining that, in the nineteenth century, "the same views" of federal power "governed both" "law and equity" "and that *Swift v. Tyson* was merely another expression of the ideas put forth in the equity cases").

In *Erie Railroad Company v. Tompkins*, the Supreme Court "disapprov[ed]" the general-principles approach to commercial law in diversity cases "declared in *Swift v. Tyson*." 304 U.S. 64, 79 (1938). The Court reasoned that *Swift* "rest[ed] upon the assumption . . . that federal courts have the power to use their judgment as to what the rules of common law are; and that in the federal courts the parties are entitled to an independent judgment on matters of general law." *Id.* (internal quotation marks omitted). This "fallacy" was "an unconstitutional assumption of powers by courts of the United States." *Id.* (internal quotation marks omitted). The Court held that "[t]here is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts." *Id.* at 78. Instead, "the law to be applied in any [diversity] case is the law of the

20-14217        WILLIAM PRYOR, C.J., concurring        5

State[,] . . . whether [that law is] declared by its Legislature in a statute or by its highest court in a decision." *Id.*

The abrogation of the common law of chancery soon followed. Days after it issued *Erie*, the Supreme Court confirmed that, "in a suit in equity," questions of substantive state law were "now to be governed, even in the absence of state statute, by the decisions of the appropriate state court." *Ruhlin v. N.Y. Life Ins. Co.*, 304 U.S. 202, 205 (1938). And in *Guaranty Trust Company v. York*, the Court explained that "Congress never gave . . . federal courts . . . the power to deny substantive rights created by State law or to create substantive rights denied by State law." 326 U.S. at 105. And it announced a test for determining whether a state law is substantive: "does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" *Id.* at 109.

This abrogation came with an important qualification: the repudiation of the common law of chancery "d[id] not mean that whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court, or conversely, that a federal court may not afford an equitable remedy not available in a State court." *Id.* at 105. "State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts." *Id.* at 106. Instead, "[e]quitable relief in a federal court" remained "subject to restrictions," including the

requirement that the suit "be within the traditional scope of equity as historically evolved in the English Court of Chancery." *Id.* at 105; *accord Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

*Guaranty Trust* was not a model of clarity, and later decisions of the Supreme Court have refined the choice-of-law analysis in three important respects. First, in *Hanna v. Plumer*, the Supreme Court acknowledged that, "in [a] sense[,] *every* procedural variation" between state and federal law "is outcome-determinative." 380 U.S. 460, 468 (1965) (internal quotation marks omitted). So, it directed courts applying "[t]he 'outcome-determination' test" announced in *Guaranty Trust* to consider "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.* As modified, the outcome-determination test requires courts "to determine whether failure to apply the state law would lead to different outcomes in state and federal court and result in inequitable administration of the laws or forum shopping." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1349–50 (11th Cir. 2018) (internal quotation marks omitted).

Second, the Supreme Court concluded "that the *Guaranty Trust* 'outcome-determination' test was an insufficient guide in cases presenting countervailing federal interests." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432 (1996). When such a countervailing interest exists, a federal court should consider whether the state rule is "merely a form and mode of enforcing" a state substantive right or "bound up with the definition of the [substantive]

20-14217        WILLIAM PRYOR, C.J., concurring        7

rights and obligations of the parties." *Byrd v. Blue Ridge Rural Elec. Coop.*, 356 U.S. 525, 536 (1958). If the state rule is "not bound up with [state-created] rights and obligations," the court must determine "whether the federal policy" at issue "should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court." *Id.* at 538.

Finally, the Supreme Court clarified "the appropriate test for resolving conflicts between state law and the Federal Rules [of Civil Procedure]." *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4 (1987). "The initial step is to determine whether, when fairly construed, the scope of [the federal rule] is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of that law." *Id.* at 4–5 (internal quotation marks omitted). "The Rule must then be applied if it represents a valid exercise of Congress'[s] rulemaking authority, which originates in the Constitution and has been bestowed on this Court by the Rules Enabling Act." *Id.* at 5; *accord Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). A court need reach the next step—the outcome-determination test—only if "the Federal Rule is inapplicable or invalid." *Shady Grove*, 559 U.S. at 398; *accord Carbone*, 910 F.3d at 1349.

The Supreme Court has declined to resolve whether federal- or state-law standards govern preliminary injunctions in diversity cases, *see Grupo Mexicano*, 527 U.S. at 318 n.3, but our Court has decided this issue. In *Ferrero v. Associated Materials Inc.*, we

reviewed a preliminary injunction granted to enforce a "covenant not to compete" governed by Georgia law. 923 F.2d 1441, 1444 (11th Cir. 1991). Because "Georgia law presume[d] that [preliminary] injunctions . . . should issue except in limited cases"—the converse of the federal approach—we "confront[ed] the threshold question of whether, under *Erie*, the [district] court should have applied federal or state law to determine the appropriateness of issuing the preliminary injunction." *Id.* at 1448. We reasoned that "Federal Rule of Civil Procedure 65 incorporate[d] traditional federal equity practice" "by reference." *Id.* And because Rule 65 "is both constitutional and within the scope of the rules' enabling act," we "appl[ied] federal procedure to determine whether the preliminary injunction was properly issued." *Id.*

If *Ferrero* still binds us, it is dispositive of the choice-of-law issue. It "makes no difference" that this appeal involves Florida law instead of Georgia law. *See Shady Grove*, 559 U.S. at 409 (plurality opinion) (emphasis omitted). "[I]t is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Id.* at 410. In the light of *Ferrero*'s holding that Rule 65 is a valid procedural rule that incorporates the federal standard for preliminary injunctions, that standard will *always* apply in diversity cases, regardless of the provisions of state law. *See id.* at 409 ("A Federal Rule of Procedure is not valid in some jurisdictions and invalid in others—or valid in some cases and invalid in others . . . .").

20-14217        WILLIAM PRYOR, C.J., concurring            9

To be sure, an intervening decision of the Supreme Court calls into question part of our reasoning in *Ferrero*. In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, the Court stated that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction." 527 U.S. at 318–19 (alterations adopted) (internal quotation marks omitted). This statement has been read to mean that "Rule 65 . . . does not . . . address the standards governing any form of injunctive relief." Morley, *supra*, at 254–55. And in the light of this statement, it is arguable that our Court was incorrect to reason that Rule 65 "incorporates traditional federal equity practice." *See Ferrero*, 923 F.2d at 1448. But *Ferrero*'s holding—that the federal standard applies to preliminary injunctions in diversity cases—remains valid even if Rule 65 does not incorporate those standards. This conclusion is consistent both with the outcome-determination test first announced in *Guaranty Trust* and with the apparent exception for equitable remedies also announced in that decision.

*Guaranty Trust* and other precedents postdating *Erie* suggest that the award of equitable relief in diversity cases remains governed by traditional equitable principles and not by state law. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842–44 (9th Cir. 2020). For example, the Supreme Court has stated that these principles inhere in the congressional grant to federal courts of jurisdiction over equitable actions. *Atlas Life Ins. Co.*, 306 U.S. at 568 ("The jurisdiction . . . conferred on the federal courts to entertain

suits in equity is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." (internal quotation marks omitted)). It has explained that this grant of authority "prescribes the body of doctrine which is to guide [courts'] decisions and enable them to determine whether . . . [to] exercise . . . the extraordinary powers of a court of equity." *Id.* It has confirmed that the "body of doctrine" for equitable relief "remain[s] unaffected" by "the fusion of law and equity [in] the [Federal] Rules of Civil Procedure." *Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n.26 (1949) (internal quotation marks omitted). And it has confirmed that state law "cannot remove these fetters from the federal courts . . . in diversity jurisdiction." *Guar. Tr.*, 326 U.S. at 106. Some circuit courts and commentators have inferred from these statements "that state law cannot" "change the nature of . . . [or] circumscribe a federal court's equitable powers[,] even when state law affords the rule of decision." *Sonner*, 971 F.3d at 842–43; *see also, e.g., id.* at 843 (collecting decisions); Morley, *supra*, at 220 ("*Guaranty Trust* requires federal courts to apply a uniform body of equitable principles tracing back to the English Court of Chancery . . . when deciding whether to grant equitable relief, regardless of whether the underlying claim arises under federal or state law."); John T. Cross, *The* Erie *Doctrine in Equity*, 60 LA. L. REV. 173, 174 (1999) (similar).

20-14217        WILLIAM PRYOR, C.J., concurring        11

Nevertheless, it is unlikely that equitable exceptionalism *alone* can justify a federal court's departure from state law, especially when it comes to the final object of the suit. *Guaranty Trust* was clear that, "[i]n giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave . . . the power to deny substantive rights created by State law." 326 U.S. at 105. And later decisions have defined a substantive rule as a rule that would cause "the character or result of a litigation materially to differ," *Hanna*, 380 U.S. at 467—a definition that is broad enough to encompass some equitable relief. For example, the extent of a court's power to award a *permanent* injunction undoubtedly affects the character—if not the result—of the litigation. *See* 19 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4513 (rev. 3d ed. 2021) ("Permanent injunctions . . . may be granted in a diversity case only if authorized by the relevant state law" because "[r]ights and remedies are closely interrelated concepts; to deviate from the state's definition of the latter often also would change the former."); *see also* Crump, *supra*, at 1235 ("Equitable remedies . . . seem to be substantive because they are the 'business end' of the rights that they enforce, and thus they determine outcomes.").

Although there is reason to believe that "the practice of borrowing state rules of decision does not apply with equal force to determining . . . equitable remedies, as it does to defining actionable rights," *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019), *Guaranty Trust* and later precedents

12                WILLIAM PRYOR, C.J., concurring            20-14217

nonetheless require federal courts to assess whether the federal in-
terest in applying traditional equity rules for a preliminary injunc-
tion must give way to a contrary state rule, *see* Crump, *supra*, at
1273; *cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 52–55
(1991) (applying the *Hanna v. Plumer* test to determine the extent
to which a court sitting in diversity could exercise its inherent pow-
ers, which are derived in part from historic equitable powers). And
that assessment counsels our application of the federal standard for
preliminary relief because, unlike permanent injunctions, prelimi-
nary injunctions "are not final awards in any sense." 11A WRIGHT
ET AL., *supra*, § 2943.

Because "a preliminary injunction is meant to keep the sta-
tus quo for a merits decision, not to replace it," *Brown v. Sec'y,
U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1225 (11th Cir.),
*vacated as moot*, __ F.4th __, No. 20-14210 (11th Cir. Dec. 29,
2021), the Florida presumption (at least in the context of a prelimi-
nary injunction) cannot be said to be "bound up with the definition
of the rights and obligations of the parties," *see Byrd*, 356 U.S at
536; *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102 (6th Cir. 1991)
(treating a preliminary injunction as procedural because its purpose
"is merely to preserve the relative positions of the parties until a
trial on the merits can be held" (quoting *Univ. of Tex. v. Came-
nisch*, 451 U.S. 390, 395 (1981))); *accord Cap. Tool & Mfg. Co. v.
Maschinenfabrik Herkules*, 837 F.2d 171, 172–73 (4th Cir. 1988). In-
deed, Florida courts treat "the standard for granting [a] temporary
injunction" as "procedural," not "substantive," for choice-of-law

20-14217        WILLIAM PRYOR, C.J., concurring        13

purposes because the standard does not "prescribe[] duties and rights," but "concerns [only] the means and methods to apply and enforce those duties and rights." *Quirch Foods LLC v. Broce*, 314 So. 3d 327, 338 (Fla. Dist. Ct. App. 2020) (internal quotation marks omitted).

The federal standard also need not "yield to the state rule in the interest of furthering the objective that the litigation . . . not come out one way in the federal court and another way in the state court." *See Byrd*, 356 U.S. at 538. To be sure, there is some possibility that the failure to apply the presumption of irreparable harm will lead to the denial of a preliminary injunction that would have been granted in state court. But this possibility does not result in a "certainty . . . or even the strong possibility that" "a different result would follow" at the preliminary-injunction stage, much less in the litigation as a whole—the inquiry that matters. *See id.* at 539; *Guar. Tr.*, 326 U.S. at 109 (focusing on whether a statute "significantly affect[s] the result of [the] *litigation*" (emphasis added)).

Aside from the presumption of irreparable harm, the standards for a preliminary injunction under Florida and federal law are similar. Florida courts and federal courts will issue a preliminary injunction only if they conclude, among other things, that the plaintiff has a substantial likelihood of succeeding on the merits, that the plaintiff will suffer irreparable harm without the preliminary injunction, and that injunctive relief is in the public interest. *See Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011); *Quirch*, 314 So. 3d at 338. And, in both

jurisdictions, a preliminary injunction is treated as an extraordinary remedy not to be awarded as a matter of course. *See Forsyth Cnty.*, 633 F.3d at 1039; *Scott v. Trotti*, 283 So. 3d 340, 343 (Fla. Dist. Ct. App. 2018). Because the standards are similar overall, the outcomes at the preliminary-injunction stage are likely to be similar, too.

Moreover, a plaintiff who succeeds on the merits at trial is entitled under Florida law to a permanent injunction for the full duration of the restrictive covenants, including the restrictive covenants that have expired. *See Quirch*, 314 So. 3d at 331 n.1. If federal courts are bound to apply this rule in diversity cases, it will be the rare case that "come[s] out one way in the federal court and another way in the state court if the federal court failed to apply" the Florida presumption at the preliminary-injunction stage. *See Byrd*, 356 U.S. at 536–37.

In short, because "there is little chance that" resolution of a motion for a preliminary injunction using the federal standard "ultimately will interfere seriously with the goals or policies of the state-created right that is being litigated," 11A WRIGHT ET AL., *supra*, § 2943, "the federal practice" need not "yield to the state rule," *see Byrd*, 356 U.S. at 540. And because the federal standard will have little impact on outcomes, application of that standard will not "result in inequitable administration of the laws or forum shopping." *See Carbone*, 910 F.3d at 1349–50 (internal quotation marks omitted); Michael Steven Green, *The Twin Aims of* Erie, 88 NOTRE DAME L. REV. 1865, 1875 (2013) ("[I]nequity is generated by substantially different rules applying to a state law action solely by

20-14217        WILLIAM PRYOR, C.J., concurring        15

virtue of the accident of diversity of citizenship." (internal quotation marks omitted)); Cross, *supra*, at 193 n.144 (Under *Hanna*, "[f]orum-shopping is objectionable when undertaken for the purpose of obtaining a different result.").

In my view, under *Erie*, the Florida standard for obtaining a preliminary injunction is a matter of procedure, not of substance. Federal courts must apply the federal standard in cases involving Florida law. And under the federal standard, a plaintiff must prove irreparable harm without the presumption afforded by Florida law. *See Snook*, 909 F.2d at 486. So, our precedent in *Ferrero* remains good law.