[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-10611

_____

CHARLES BALDWIN,

Plaintiff-Appellee,

*versus*

EXPRESS OIL CHANGE, LLC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-03874-AT

_____

Before JILL PRYOR, GRANT, and HULL, Circuit Judges.

JILL PRYOR, Circuit Judge:

This appeal requires us to address a novel issue of state law: the proper application of the presumptions of reasonableness contained in the Georgia Restrictive Covenants Act ("GRCA"). In deciding this case, the district court was confronted with difficult issues involving complex business arrangements and a Georgia statute that both rejiggered a significant body of Georgia common law and remains largely untested by Georgia's appellate courts.

Applying the GRCA, the district court preliminarily enjoined the enforcement of a restrictive covenant between a national automotive service chain and a former employee of its franchisees. The district court found the covenant to be unreasonable in two respects: its geographic scope and its duration. We agree that the covenant's geographic scope is unreasonable (and thus unenforceable) under the GRCA. But the district court applied the wrong presumption when it concluded that the covenant's duration was unreasonable under the GRCA. And part of this appeal is now moot. We thus affirm in part, vacate in part, dismiss the appeal in part, and remand to the district court to reconsider aspects of its preliminary injunction under the proper presumptions.

## I.     BACKGROUND

For more than 20 years, appellee Charles Baldwin worked as an employee of various franchisees of appellant Express Oil Change, LLC, a national automotive service chain. Baldwin's relationship with Express began in 1998, when Express purchased a

group of privately owned automotive stores in Atlanta operating under the name Tune-Up Clinic. Baldwin worked at Tune-Up as a store manager and, after the purchase, came to be under the supervision of one of Express's franchisees, Adam Fuller.

Over the years, as Fuller acquired additional Express franchises, Baldwin's responsibilities grew. When Fuller owned eight stores (around January 2001), he asked Baldwin to take on the role of area manager, overseeing operations for all eight stores—a "manager of managers." Doc. 25 at 14.[1] Baldwin's role included neither significant marketing responsibilities nor customer interactions. He would occasionally greet customers or help resolve customer complaints, and he was able to look up the history of one customer at a time in Fuller's "point of sale system." *Id*. at 16. But Baldwin lacked access to a complete customer list and focused his efforts on "train[ing] and coach[ing] and support[ing] other store managers" rather than interacting with customers. *Id*. at 14. By all accounts, Baldwin was a superior employee.[2]

While Baldwin served as area manager, Fuller entered a series of business relationships with Darrell Lamb, another Express franchisee. In 2006, when the pair purchased their first store together, Baldwin trained and supported its manager, as he had with

---

[1] "Doc." numbers refer to the docket entries of the district court.

[2] The district court's description of Baldwin as a "highly talented employee" is well-supported by the record. Doc. 30 at 44. Baldwin won a national award from Express. And a former Express executive called Baldwin "an excellent operator with [Express]." Doc. 25 at 72.

Fuller's other stores. Later, Fuller and Lamb jointly purchased four more stores. They formed a limited liability company ("LLC") called Middle Georgia Investments to hold these four stores.

Fuller and Lamb placed these stores under Baldwin's supervision and restructured his compensation. They increased Baldwin's salary, granted him five percent "phantom equity" in Middle Georgia Investments, and offered him 15 percent of the stores' profits. *Id.* at 21. According to Baldwin, his phantom equity meant that if Fuller and Lamb sold Middle Georgia Investments, he would receive five percent of the net proceeds, but he gained no "additional rights in the operation and overs[ight] of" the entity. *Id.* at 21.

Fuller and Lamb later purchased two more stores in Georgia, which they placed under a new LLC, 138 Investments. They asked Baldwin to oversee the new stores. In exchange, they offered him "sweat equity" in 138 Investments. *Id.* at 22. Baldwin received 15 percent of the profits generated by 138 Investments and—provided he met sales targets at the new stores—15 percent "phantom equity" in the LLC. *Id.* at 23. Baldwin testified that this equity operated just like his interest in Middle Georgia Investments: he was entitled to 15 percent of the net proceeds of 138 Investments upon its sale but gained no management or operational rights in 138 Investments. Despite his "equity" in both Middle Georgia Investments and 138 Investments, Baldwin never signed a franchise agreement with Express, and he invested none of his own money

in either entity. But Baldwin did become a member of 138 Investments.

Fuller and Lamb also formed an employee leasing company—Velocity Ventures, Inc.—to provide employees for their stores. After its formation, Velocity employed Baldwin as its "senior vice president of operations." Doc. 30 at 5. In that role, he was no longer employed directly by the stores or the entities that held them.[3]

Eventually, Express sought to buy out Fuller and Lamb to convert their franchised stores into corporate-owned ones. Baldwin learned in March of 2021 that a sale was imminent. On a Friday, Fuller emailed Baldwin to ask him to attend a meeting the next morning, along with Lamb. When Baldwin arrived, Fuller explained that the pair planned to sell 29 stores (of which Baldwin managed 18) to Express and that the deal was scheduled to close on Monday. Fuller gave Baldwin a summary of the proposed sale showing that Baldwin would receive a total payment of $1,985,402: $1,104,352 for his 15 percent interest in 138 Investments, $600,616 for his five percent interest in Middle Georgia Investments, and

---

[3] "Employee-leasing companies hire employees and then lease them out to clients." *Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 815 F.3d 1293, 1295 n.1 (11th Cir. 2016) (internal quotation marks omitted). The benefit of such an arrangement to the client is the ability to obtain "the leased employees' labor" without "the attendant administrative, financial, and legal responsibilities" that come with being an employer. *Id*.

6                    Opinion of the Court                    22-10611

$321,441 for a six percent interest in an entity called Knoxville Express.[4]

But there was a catch. Fuller handed Baldwin a contract with a restrictive covenant, limiting Baldwin's ability to compete against Express, and a consent to an asset purchase agreement concerning 138 Investments. Unless Baldwin signed both documents, Fuller told him, there would be no sale and Baldwin would receive no payment. Fuller also told Baldwin that he could not view the asset purchase agreement to which he was required to consent.

At first, Baldwin protested. He told Fuller and Lamb that he was not an owner of 138 Investments, had not signed a franchise agreement, did not wish to agree to something he could not review, and did not "feel comfortable" agreeing to a restrictive covenant. Doc. 25 at 34. Unable to reach an agreement with Fuller and Lamb, Baldwin next met with a representative of Express, its then-outgoing executive chairman, Ricky Brooks. Baldwin told Brooks that he just wanted payment of his equity based on his prior agreements with Fuller and Lamb. Brooks replied, "we absolutely do not want you competing against us," and he explained that the purchase price reflected the assumption that Express would receive covenants from Fuller, Lamb, and Baldwin. *Id.* at 38.

---

[4] The term sheet Fuller and Lamb gave Baldwin shows a payout of $321,441 to Baldwin based on a $5,357,352 valuation of two stores held by "knox exp." Doc. 16 at 6. Baldwin confirmed that he received this payment.

Ultimately Baldwin relented. After concluding that "80 percent of [his] retirement [was] hanging in the balance" and receiving concessions from Express, he signed both documents so that he could receive the payment. *Id*. at 41. He dated the signed restrictive covenant March 8, 2021.

The restrictive covenant Baldwin signed contained a series of provisions limiting his ability to work for or otherwise be involved in competing automotive service businesses. In Section 1 of the covenant, Baldwin promised that he would not "engage in, invest in, become an owner of, advise, or become a landlord and/or lender of, or employed by, or construct a facility for . . . a Competitive Business" within a defined "Non-Competition Area." Doc. 1-1 at 50 (internal quotation marks omitted). The covenant defined a competitive business as "an automotive repair or service business . . . which promotes as one or more of its services any form of retail sales of new tires and/or tire-related services, tire rotation, balancing and alignment, oil change services, quick lube services, brake repair or replacements services, transmission repair or service, automotive repairs or similar service." *Id*. (internal quotation marks omitted). It defined the non-competition area to include all of Georgia and Alabama, as well as "a five (5) mile radius of any automotive repair or service facility business operated by Purchaser in the continental United States." *Id*. The covenant defined "Purchaser" to include, in addition to Express, certain affiliates, including Mavis, a national automotive tire chain, and its affiliates. The agreement contained no list of the locations operated by Express and the affiliates but stated that one would be provided "upon

request." *Id*. at 51. As of 2021, the Mavis corporate umbrella included at least 1,100 franchises in 29 states. In Section 2 of the covenant Baldwin also agreed not to engage in targeted solicitation of Express's customers or employees.

The covenant provided that its terms would remain in force for four years. But, after 18 months, the non-competition area would no longer include the entirety of Georgia and Alabama, and Baldwin would be permitted to become an employee of a competitive business, even within the reduced non-competition area.

Following the sale, Baldwin briefly worked for Express. For 12 weeks the parties sought to negotiate a role for Baldwin in the combined business. Ultimately, though, Express and Baldwin failed to reach an agreement. Express offered Baldwin significantly less compensation than Fuller and Lamb had and would have required Baldwin to undertake significant travel, something he did not do under Fuller and Lamb. Baldwin resigned and parted ways with Express.

In August 2021, while the covenant remained in full force, Baldwin began to explore other business opportunities. He considered purchasing an independent repair shop located just under five miles from an Express location. He contacted Brooks, as Express's representative, to request permission. Brooks's superiors told Baldwin that permission was refused: Express would enforce the covenant.

Baldwin, a Georgia resident, sued Express in Superior Court in Gwinnett County, Georgia, seeking a declaration that Sections 1

and 2 of the restrictive covenant were unenforceable under the GRCA, and requesting an injunction barring Express from enforcing these sections against Baldwin. Baldwin moved for a preliminary injunction in the Georgia court, arguing in part that these sections violated the GRCA. Baldwin argued that the covenant agreement contained restrictions that were unreasonable (and thus unenforceable under the GRCA) "in terms of time, geography, and scope." *Id*. at 6. Baldwin argued that the 48-month term of the covenant was presumptively unreasonable and the geographic scope of the covenant was unreasonably broad. Express—a citizen of Delaware and New York—removed the action to the United States District Court for the Northern District of Georgia, pursuant to 28 U.S.C. § 1441. *See also* 28 U.S.C. 1332(a).[5]

---

[5] After Express appealed, we issued a jurisdictional question to the parties about Baldwin's and Express's respective citizenships, which Express's pleadings below had not adequately alleged. *See* 28 U.S.C. 1332(a)(1) (providing district courts with jurisdiction over controversies between citizens of different states where amount in controversy exceeds $75,000); *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1342 n.12 (11th Cir. 2011) (explaining that pleadings ordinarily must allege the parties' citizenship in diversity cases). We allowed Express to amend its pleadings to allege that Baldwin is a citizen of Georgia and Express a citizen of Delaware (its sole member's place of incorporation) and New York (its sole member's place of business). *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1221 (11th Cir. 2017) ("The citizenship of an LLC is the citizenship of each member."); 28 U.S.C. § 1332(c)(1) (specifying that, for purposes of determining diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business").

After removal, Baldwin renewed his motion for a preliminary injunction before the district court, which held an evidentiary hearing. At the hearing, the district court heard argument from Baldwin and Express as well as live testimony by Baldwin, Brooks, and James Durkin, the president of Express.

Brooks and Durkin testified to Express's reasons for pursuing the restrictive covenant. Brooks explained that Express did not "want to buy the assets of a franchise operation . . . and then have them take that money and compete against [it]." Doc. 25 at 72–73. He explained Express's concern that Baldwin, freshly infused with capital, could "acquire or build an operation" and "not only compete for Express's customers but [also] solicit team members specifically and directly that helped build [Express's] business." *Id*. at 73. To allay these concerns, Brooks testified, Express "paid a significant premium for the noncompete." *Id*. Durkin explained the importance of retaining Express's existing employees—particularly its mechanics, whom Durkin referred to as technicians. He testified that without good technicians, Express could not meet the demands of its customers. He also testified that the market for hiring and retaining technicians was exceptionally competitive. Because customers often develop a service relationship with a single technician, when "a technician leave[s], customers will follow," he said. *Id*. at 90–91.

Express also sought to show that Baldwin would receive a windfall if the district court allowed him to compete in violation of the covenant. In an affidavit, another Express executive estimated

that Baldwin could generate $1,000,000 annually in revenue and $250,000 annually in profit by operating a single automotive service shop in Georgia, based on Baldwin's "experience in th[e] industry, and the revenue and profit generated by the [Express] franchise units that Mr. Baldwin ran." Doc. 12-1 at 4.

Following the hearing, the district court issued a preliminary injunction partly enjoining Express from enforcing Baldwin's covenant. The district court found that Express had a legitimate business interest in "preventing Baldwin from luring away its technicians and, vicariously, its customers." Doc. 30 at 23; *see also* O.C.G.A. § 13-8-51(9)(C) (defining "[l]egitimate business interest[s]" to include "[s]ubstantial relationships with specific prospective or existing customers, patients, vendors, or clients"). With this interest in mind, the district court concluded that two aspects of Section 1 of the covenant were unreasonable and unenforceable under the GRCA. First, it concluded the covenant's geographic scope was unreasonable and thus unenforceable under O.C.G.A. §§ 13-8-53(b) and 13-8-56(2). The court found that the scope of the geographic restrictions—the entirety of two states and the five-mile radius surrounding more than 1,100 franchised locations—was far greater than necessary to protect Express's interest in retaining its technicians. Second, it concluded that the covenant's four-year term was presumptively unreasonable under O.C.G.A. § 13-8-57(b), which presumes unreasonable "a restrictive covenant sought to be enforced against a former employee and not associated with the sale or ownership" of a business if its duration exceeds two years.

The district court "blue-penciled" Section 1 of the covenant—meaning, the court re-wrote the covenant to make it enforceable under Georgia law and enjoined Express from enforcing the covenant except as revised. The district court altered Section 1 in four ways. First, it reduced the term of the covenant from four years to two years. Second, it eliminated the states of Georgia and Alabama from the non-competition area. Third, it amended the five-mile radius provision of the non-competition area so that it only applied to those Express locations Baldwin previously had overseen. And fourth, it eliminated the provisions that stepped down certain restrictions on Baldwin at the 18-month mark.

As revised, Section 1 read:

Baldwin covenants and agrees that, from the Effective Date hereof until the ~~forty eighth (48)~~**twenty-fourth (24)** month anniversary of the date hereof (the "**Term**"), he will not directly or indirectly (through an entity), engage in, invest in, become an owner of, advise, or become a landlord and/or lender of, or employed by, or construct a facility for an automotive repair or service business (other than Purchaser, if Baldwin and Purchaser agree for Baldwin to become an employee of Purchaser) which promotes as one or more of its services any form of retail sales of new tires and/or tire-related services, tire rotation, balancing and alignment, oil change services, quick lube services, brake repair or replacements services, transmission repair or service, automotive repairs or similar service (a "Competitive Business"), and which business is located ~~(i) in the State of Georgia or the State~~

> ~~of Alabama, or (ii)~~ within a five (5) mile radius of any automotive repair or service facility business operated by Purchaser **that Baldwin previously oversaw while he was overseeing Purchaser's franchises.** ~~in the Continental United States (the "**Non-Competition Area**").~~[6]

In the same order, pursuant to Federal Rule of Civil Procedure 65(c), the district court imposed an injunction bond. Recognizing that it had "authorized Baldwin to engage in direct competition with [Express's] franchises, albeit in a limited matter" in a "case present[ing] arguably novel issues of law," the district court required Baldwin to post a $40,000 injunction bond. Doc. 30 at 46.

Express appealed the district court's order granting a preliminary injunction and setting bond. This is Express's appeal.

## II. STANDARD OF REVIEW

We review a district court's ruling on a motion for a preliminary injunction for abuse of discretion. *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1288 (11th Cir. 2022). A district court abuses its discretion when "it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings

---

[6] Text added by the district court is shown in **bold type**. Text removed by the district court is shown in ~~strikethrough~~. The district court also eliminated the remaining provisions of Section 1, which the district court's revisions rendered superfluous. *See* Doc. 30 at 45 (showing revisions to Section 1); Doc. 1-1 at 50–51 (original text of Section 1).

of fact that are clearly erroneous." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 773–74 (11th Cir. 2015) (internal quotations omitted). "An error of law is an abuse of discretion *per se*." *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019) (internal quotation marks omitted).

When a district court sets an injunction bond pursuant to Federal Rule of Civil Procedure 65(c), "[t]he amount of [the] injunction bond"—and the choice of whether to set a bond at all— "is within the sound discretion of the district court." *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). We thus review the order setting bond for abuse of discretion. *Id.*

## III.    ANALYSIS

On appeal, Express raises two issues: whether the district court abused its discretion by (1) partly enjoining Express from enforcing the restrictive covenant and (2) not requiring a greater bond amount. We address each issue in turn.

### A.  The Preliminary Injunction

We first consider Express's challenge to the district court's injunction.

In general, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008). Here, the parties almost exclusively brief the first factor, and we focus our analysis accordingly.

At the heart of the merits inquiry in this case is the Georgia Restrictive Covenants Act, O.C.G.A. § 13-8-50 *et seq*. Enacted in 2011, the GRCA provides a statutory framework for determining the enforceability of Georgia-law restrictive covenants. 2011 Ga. Laws 99. In general, it specifies that the "enforcement of contracts that restrict competition during the term of a restrictive covenant" shall be permitted "so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a). By contrast, a covenant that is unreasonable in scope, duration, or geographic area and thus violates § 13-8-53(a) "is unlawful and [] void," *id*. § 13-8-53(d), and "shall not [be] enforce[d]," *id*. § 13-8-54(b). *See Motorsports of Conyers, LLC v. Burbach*, 892 S.E.2d 719, 726 (Ga. 2023); *Belt Power, LLC v. Reed*, 840 S.E.2d 765, 771 (Ga. Ct. App. 2020) ("[U]nreasonable restrictive covenants are against Georgia public policy.").[7] A party seeking to enforce a

---

[7] Because our jurisdiction in this case rests on diversity of citizenship, *see* 28 U.S.C. § 1332, we apply the substantive law of Georgia—the forum state, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Under *Erie*, when a state's highest appellate court (in this case the Georgia Supreme Court) has addressed an issue of state law, we simply apply its holding. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014). But when we are confronted with a state law issue of first impression, we must attempt to predict how the state's highest court would decide the issue. *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). To hazard such an "*Erie* guess," we look to decisions of the state's intermediate court of appeals for guidance. That means

16                    Opinion of the Court                    22-10611

covenant under the GRCA must also "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." O.C.G.A. § 13-8-55. Thus, to be enforceable, a Georgia law restrictive covenant must generally be both reasonable and supported by a legitimate business interest. Where part of a restrictive covenant is unenforceable, the GRCA affords courts the authority to "modify a covenant that is otherwise void and unenforceable." *Id*. § 13-8-53(d). Such modification is known as "blue-penciling." *Burbach*, 892 S.E.2d at 725.

The GRCA creates presumptions that address when a restrictive covenant's geographic scope and time duration are reasonable. Section 13-8-56(2) requires a court to "make" a series of "presumptions" when determining the reasonableness of the "geographic territory" encompassed by a restrictive covenant. And § 13-8-57 provides "rebuttable presumptions" for "determining the reasonableness in time of a restrictive covenant sought to be enforced after a term of employment."

Under this framework, Express raises three challenges to the district court's evaluation of Baldwin's likelihood of success on the merits. Express argues: (1) the geographic scope of the covenant agreement is reasonable, (2) the duration of the covenant agreement is reasonable, and (3) the district court exceeded its remedial

we apply the decisions of the Georgia Court of Appeals unless there is "persuasive indication that the [Georgia Supreme Court] would rule otherwise." *CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 791 (11th Cir. 1999).

authority when it blue-penciled the covenant agreement. We address each of these challenges before turning to the remaining preliminary injunction factors.

### i.    *Geographic Scope*

The district court concluded that the geographic scope of the covenant was unenforceable under the GRCA. It proceeded to blue-pencil the agreement's geographic reach in two ways: first, it eliminated the agreement's 18-month prohibition on competitive activities anywhere within Georgia and Alabama, and second, it limited the agreement's prohibition on competitive activities within five miles of any automotive service or repair business operated by Express to only those 18 locations Baldwin managed. On appeal, Express argues that the broad geographic reach of the agreement was enforceable.

At the outset, we conclude that one aspect of this appeal is now moot. *See United States v. Sec'y, Fla. Dep't of Corrs.*, 778 F.3d 1223, 1226 (11th Cir. 2015) (observing that "we have an obligation to notice and decide mootness issues" *sua sponte*). An issue "becomes moot . . . when [it is] no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). On appeal from a preliminary injunction, "intervening events" may moot "the appeal by preventing us from granting any effectual relief whatever in favor of the appellant." *Vital Pharms.*, 23 F.4th at 1288 (internal quotation marks omitted).

The non-compete agreement defines a "Non-Competition Area" within which Section 1's restrictions apply. Doc. 1-1 at 50. The area is defined as: "the State of Georgia or the State of Alabama, or . . . [the area] within a five (5) mile radius of any automotive repair or service facility business operated by Purchaser in the continental United States." *Id.* After 18 months, however, the agreement reduces the Non-Competition Area by eliminating the blanket restriction on Baldwin's activities in Georgia and Alabama. Because Baldwin and Express executed the agreement on March 8, 2021, the Non-Competition Area narrowed on September 8, 2022—as Express acknowledges. So Section 1 no longer applies statewide in Georgia and Alabama.

To the extent the preliminary injunction prevented Express from enforcing the agreement with respect to Baldwin's activity in Georgia and Alabama but not within five miles of an automotive repair or service facility business operated by Express, the injunction can no longer "affect the rights of the litigants." *Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1121 (11th Cir. 1995) (internal quotation marks omitted). We therefore lack jurisdiction to review the enforceability of the statewide provision. *See Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) ("[M]ootness is jurisdictional."). We dismiss the appeal as moot to the extent it challenges the district court's injunction against enforcing the since-expired portion of the covenant. *See Vital Pharms.*, 23 F.4th at 1286.

Now to the live portion of the parties' dispute over the covenant's geographic scope. Section 13-8-56(2) governs the

reasonableness (and thus enforceability) of a restrictive covenant's "geographic territory." This section creates a "presumption" that:

> A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable, provided that:
>
> (A) The total distance encompassed by the provisions of the covenant also is reasonable;
>
> (B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship; or
>
> (C) Both subparagraphs (A) and (B) of this paragraph.

O.C.G.A. § 13-8-56(2). The covenant's prohibition on competition by Baldwin within a five-mile radius of any location operated by Express or its affiliates does not satisfy any of § 13-8-56(2)'s three prongs; thus, it is not presumptively reasonable.

Setting aside subsection (A) for the time being, we find that the agreement does not "contain[] a list of particular competitors as prohibited employers." *Id*. § 13-8-56(2)(B). The closest it comes is a provision obliging Express to provide Baldwin with "its then current list of facilities operated by Purchaser and its Affiliates" on request. Doc. 1-1 at 51. But that list is not "contain[ed]" in the agreement. O.C.G.A. § 13-8-56(2)(B). Furthermore, the described list is not of "particular competitors as prohibited employers." *Id.*

Because the agreement does not satisfy subsection (B), it follows that it cannot satisfy subsection (C), which applies only when "[b]oth subparagraphs (A) and (B) of this paragraph" are satisfied. *Id*. § 13-8-56(2)(C).

Turning now to subsection (A), we conclude that the district court did not abuse its discretion when it ruled that the agreement did not satisfy (A) because "[t]he total distance encompassed by the provisions of the covenant" was not "reasonable." *Id*. § 13-8-56(2)(A). Based on testimony it heard at the preliminary injunction hearing, the district court determined that Express's "legitimate business interest[,]" *id*. § 13-8-55, in restricting Baldwin's ability to compete was in "preventing Baldwin from luring away its technicians and, vicariously, its customers," doc. 30 at 23. The court also observed that although Baldwin oversaw only 18 Georgia-based franchises, the covenant applied to the five-mile radius surrounding each of "1100 [to] 1200 franchises operating . . . across 29 states"—an area comprising tens of thousands of square miles. *Id*. at 10. Comparing Express's business interest to the geographic scope of the restriction, the district court found that Baldwin was unlikely to poach technicians or clients from Express "in service areas where Baldwin did not previously operate and has no apparent relationships with [Express's] technicians or customers." *Id*. at 26. It thus determined that Express lacked "a legitimate business interest in restricting Baldwin outside his prior service area." *Id*.

We agree with the district court. The mismatch between Express's interests and the scope of the geographic restrictions the

covenant imposes on Baldwin supports the conclusion that the "total distance encompassed by the provisions of the covenant" is not "reasonable." O.C.G.A.§ 13-8-56(2)(A). Although the GRCA does not specify how we must determine whether the total geographical distance encompassed by a restriction is reasonable, at least three independent reasons support such a comparative approach.

First, the GRCA requires a party seeking to enforce a covenant to "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." *Id.* § 13-8-55. As a matter of internal statutory consistency, it would be odd if a covenant whose scope was unsupported by a legitimate business interest could nevertheless be reasonable. *See Fed. Deposit Ins. Corp. v. Loudermilk*, 826 S.E.2d 116, 120 (Ga. 2019) (when construing Georgia statutes, courts "may look to other provisions of the same statute [and] the structure and history of the whole statute" (internal quotation marks omitted)); *see also* O.C.G.A. § 13-8-50 (finding that "reasonable restrictive covenants . . . protect[] legitimate business interests").

Second, in applying the GRCA, the Georgia Court of Appeals has evaluated the reasonableness of geographic restrictions by reference to the business interests they protect. *See Kennedy v. Shave Barber Co., LLC*, 822 S.E.2d 606 (Ga. Ct. App. 2018). In *Kennedy*, the court considered the reasonableness of a non-compete provision under the GRCA. That provision barred a former employee, Kennedy, of a barbershop, The Shave, from operating her own

22                    Opinion of the Court                    22-10611

shop within three miles of her former employer.[8] Citing and ap-
plying O.C.G.A. § 13-8-56(2), the Georgia Court of Appeals con-
cluded a three-mile radius was reasonable because it was supported
by the specific business interests Kennedy's employer identified.
Record evidence showed that "most of The Shave's customers
live[d] and work[ed] within three miles" of its location and that
"when two former employees of The Shave opened competing bar-
bershops within three miles," The Shave had lost customers and
business. *Id*. at 612. So the restriction was reasonable "[b]ased on
the limited territorial restriction involved in the non-compete cov-
enant, and the demonstrated harm if the covenant is not enforced."
*Id*. Taking our cue from the Georgia Court of Appeals, we likewise
determine whether the "total distance encompassed by the provi-
sions of the covenant" is or is not "reasonable," O.C.G.A. § 13-8-
56(2)(A), by considering the territorial restriction in light of the
business interest it protects, *see CSX Transp., Inc. v. Trism Specialized
Carriers, Inc.*, 182 F.3d 788, 791 (11th Cir. 1999).

Third, Georgia common law embraced a similar approach
before the enactment of the GRCA—"judging the reasonableness
of . . . territorial restrictions [by] considering the nature of the

___

[8] More specifically, the non-compete (as modified and enforced by an injunc-
tion issued by the Fulton County Superior Court) prevented the employee
from "owning, operating, promoting, selling for, soliciting for, consulting for,
controlling or participating in the ownership, operation, or management of a
business selling or providing the services the same or similar to that provided
by The Shave within a three-mile radius of The Shave." *Kennedy*, 822 S.E.2d at
610.

business involved, and the facts surrounding each case." *Barry v. Stanco Commc'ns Prods., Inc.*, 252 S.E.2d 491, 494 (Ga. 1979). Often, this meant comparing the geographic scope of a covenant to the interests that underlay it. *See id.* ("[T]he territorial limitation in this case was reasonable, and a legitimate protection of Stanco's investment in customer relations."); *see also Howard Schultz & Assocs. of the Se., Inc. v. Broniec*, 236 S.E.2d 265, 268 (Ga. 1977) (explaining that territorial restrictions on competition outside of "the territory in which the employee was employed" generally require "a showing by the employer of the legitimate business interests sought to be protected"). And when applying Georgia law, we construe statutes "in connection and in harmony with the existing law," *Grange Mut. Cas. Co. v. Woodard*, 797 S.E.2d 814, 819 (Ga. 2017) (internal quotation marks omitted), and strictly against "derogation of the common law," *Quynn v. Hulsey*, 850 S.E.2d 725, 732 (Ga. 2020); *see also Kennedy*, 822 S.E.2d at 612 n.6 (citing pre-GRCA case law to determine reasonableness). We see nothing in the GRCA that undermines this common-law approach.

The district court relied on other theories, too, when it determined that the geographic scope of the covenant agreement was unreasonable. We do not adopt its analysis wholesale.[9] Rather,

---

[9] For example, the district court also concluded that the geographic scope of the restrictions was incompatible with O.C.G.A. § 13-8-53(b). But to us, O.C.G.A. § 13-8-53(b) appears to apply to non-solicitation provisions (like those contained in Section 2 of the agreement) rather than non-compete provisions (like those contained in Section 1). In *Kennedy*, the Georgia Court of

we conclude the district court's relevant findings—that Express's legitimate business interest is in preventing Baldwin from "luring away its technicians and, vicariously, its customers" and that the geographic "restrictions on Baldwin go much further than that"—are not clearly erroneous and support the district court's conclusion that the geographic reach of the covenant is unreasonable under the GRCA. Doc. 30 at 23–24.

Express's counterargument does not persuade us. To support its position that the geographic scope of the covenant is reasonable, Express points to O.C.G.A. § 13-8-53(c)(1), which provides in part that "[w]henever a description of activities, products, or services, or geographic areas, is required by this Code section, any description that provides fair notice of the maximum reasonable scope of the restraint shall satisfy such requirement." Express argues, based on this GRCA subsection, that the "geographic limitation is reasonable under Georgia law because [Baldwin] had fair notice of its maximum bounds." Appellant's Br. at 27. But, under Georgia law, reasonableness and notice are distinct issues. *See Am. Plumbing Pros., Inc. v. ServeStar, LLC*, 870 S.E.2d 518, 522 (Ga. Ct.

---

Appeals applied this provision only to analyze the non-solicitation aspects of a covenant. *Kennedy*, 822 S.E.2d at 613. It did not consider this provision in addressing the reasonableness of the geographic scope of a non-compete clause. *See id.* at 612. Moreover, the provision specifies that "[n]o express reference to geographic area . . . shall be required in order for the restraint to be enforceable," meaning it cannot govern when a geographic area is reasonable. O.C.G.A. § 13-8-53(b). Our doubts aside, the district court's determination that the geographic scope of the covenant was unreasonable is well-supported by the grounds we discuss above.

App. 2022) (vacating determination that geographic restriction was "vague" under § 13-8-53(c)(1) but reserving "whether the geographic restriction is reasonable"). O.C.G.A. § 13-8-53(c)(1) does not concern whether a geographic restriction is reasonable. Instead, it addresses "the language that is necessary for geographic limitations" to be sufficiently specific to enforce. *Id.* at 520. The district court did not conclude that the language describing the geographic scope of the covenant was unenforceable because it was vague. Neither do we. Even if Express is correct that the geographic restriction is sufficiently precise, it remains unenforceable because it is not reasonable under the GRCA.

### ii.    Duration

Express also attacks the district court's injunction for limiting the duration of Section 1. Express argues that the district court abused its discretion because it applied the wrong GRCA presumption to determine whether the covenant's four-year duration was unreasonable. Here, we agree with Express. The district court should have applied the five-year rebuttable presumption of reasonableness contained in O.C.G.A. § 13-8-57(d) and not the two-year presumption contained in O.C.G.A. § 13-8-57(b). Because a district court abuses its discretion when "it applies an incorrect legal standard," *Jysk*, 810 F.3d at 773–74 (internal quotation marks omitted), or commits an "error of law," *Managed Care Advisory Grp.*, 939 F.3d at 1153 (internal quotation marks omitted), we partly vacate the preliminary injunction.

The GRCA supplies "rebuttable presumptions" a court must apply when "determining the reasonableness in time of a restrictive covenant sought to be enforced after a term of employment." O.C.G.A. § 13-8-57(a). Under Georgia law, the amount of time for which it is presumptively reasonable to restrict a person from competing with a business depends on the person's relationship with the business. Two rebuttable presumptions are at issue here.

The first presumption, the one the district court applied, is found in O.C.G.A. § 13-8-57(b). This subsection governs:

> (b) In the case of a restrictive covenant sought to be enforced against a former employee and not associated with the sale or ownership of all or a material part of:
>
> (1) The assets of a business, professional practice, or other commercial enterprise;
>
> (2) The shares of a corporation;
>
> (3) A partnership interest;
>
> (4) A limited liability company membership; or
>
> (5) An equity interest or profit participation, of any other type, in a business, professional practice, or other commercial enterprise[.]

When subsection (b) applies, a court must "presume to be reasonable in time any restraint two years or less in duration and . . . presume to be unreasonable in time any restraint more than two years

in duration, measured from the date of the termination of the business relationship." *Id.* § 13-8-57(b).

Express argues the district court should instead have applied the second presumption, which is contained in O.C.G.A. § 13-8-57(d), and governs:

> (d) In the case of a restrictive covenant sought to be enforced against the owner or seller of all or a material part of:
>
> (1) The assets of a business, professional practice, or other commercial enterprise;
>
> (2) The shares of a corporation;
>
> (3) A partnership interest;
>
> (4) A limited liability company membership; or
>
> (5) An equity interest or profit participation, of any other type, in a business, professional practice, or other commercial enterprise[.]

Subsection (d)'s rebuttable presumption requires a court to "presume to be reasonable in time any restraint . . . five years or less in duration . . . [and] presume to be unreasonable in time any restraint more than . . . five years in duration . . . measured from the date of termination or disposition of such interest." *Id.* § 13-8-57(d). So the four-year term of the non-competition restriction is presumptively (but rebuttably) unreasonable if subsection (b) applies, but presumptively (and rebuttably) reasonable if subsection (d) applies.

28                    Opinion of the Court                    22-10611

We conclude that subsection (d) applies because, in the context of the sale of all or a material part of the assets of a business, Baldwin was a "seller" as that term is used in O.C.G.A. § 13-8-57(d). *See id.* (applying to "the owner or seller of all or a material part of" various business interests). The GRCA defines a "seller" as "[a]n owner of a controlling interest" (in turn defined as an equity or ownership interest involving 25 percent profit participation or voting control), their "affiliate," or "an executive employee of the business who receives, at a minimum, consideration in connection with a sale." *Id.* § 13-8-51(4), (17). The GRCA also defines an executive employee to include a director, "officer, [] key employee, [] manager, or [] supervisor of an employer." *Id.* § 13-8-51(7).[10]

Baldwin was an executive employee because he was a manager. *See id.* Indeed, the district court found that he was a "manager of managers." Doc. 30 at 3.[11] Baldwin also received "consideration

---

[10] A few other defined terms play a role here, but either their application is undisputed by the parties or unnecessary to our disposition. O.C.G.A. § 13-8-51(8) defines a "key employee." O.C.G.A. § 13-8-51(16) defines a "sale." But nobody disputes that a sale occurred, and we need not consider whether Baldwin was a "key employee" of Express because we conclude he was a "manager." *See* O.C.G.A. § 13-8-51(7).

[11] At oral argument, we raised the possibility that Baldwin may not have been an "executive employee *of the business*"—that is, of one of the entities sold to Express. O.C.G.A. § 13-8-51(7) (emphasis added). After all, at the time of the sale Baldwin was not a direct employee of 138 Investments, Middle Georgia Investments, or Knoxville Express. Instead, he was an employee of Velocity Ventures—the employee leasing company established by Fuller and Lamb

in connection with [the] sale" of Fuller and Lamb's assets, as well as for the covenant agreement itself. O.C.G.A. § 13-8-51(17)(B). Recall that Baldwin received nearly $2 million because of the sale—$1,104,352 for his 15 percent interest in 138 Investments, $600,616 for his five percent interest in Middle Georgia Investments, and $321,441 for a six percent interest in Knoxville Express. The price Express paid included a premium for the restrictive covenants executed by Baldwin, Fuller, and Lamb—so Baldwin received more money by virtue of the covenant agreement.

Although Baldwin meets the GRCA's definition of "seller," the district court concluded that O.C.G.A. § 13-8-57(d) did not apply. The district court reasoned that Baldwin was not a "seller of a material part of the assets" purchased by Express, "even if" he met "the GRCA's broader definition of a seller." Doc. 30 at 32.

The district court based its conclusion on the rule against surplusage. Georgia law recognizes the oft-recited rule that, "in construing a statute" courts should "avoid a construction that makes some language mere surplusage." *Loudermilk*, 826 S.E.2d at 574 (internal quotation marks omitted); *see also Walker v. State*, 723 S.E.2d 894, 898 (Ga. 2012) (deeming this rule "fundamental").

---

that was not (so far as we can tell) sold to Express. We choose not to address this possibility, however, because neither the parties nor the district court addressed it. And we generally do not assume an initiating role by considering issues the parties have not raised. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (observing that in our adversarial system, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present").

Applying the rule, the district court rejected an interpretation of O.C.G.A. § 13-8-57(d) that it determined, would "render the phrase 'material part' superfluous" by applying subsection (d) to any "seller" and concluded that the five-year presumption contained in subsection (d) should apply only "to the owner of all or a material part of the assets or the seller of the same." Doc. 30 at 31–32 (internal quotation marks omitted).

"[M]aterial part" must do some work here. But we find the district court's approach inconsistent with the GRCA's definition of "seller." *See* O.C.G.A. § 13-8-51(17)(B) (defining seller to include "[a]n executive employee of the business who receives, at a minimum, consideration in connection with a sale"). Grafting the district court's requirement on to the GRCA's definition of seller produces a test that fails to account for executive employees. As construed by the district court, O.C.G.A. § 13-8-57(d) would apply to: an executive employee of the business who receives, at a minimum, consideration in connection with a sale and who sells all or a material part of the assets of a business. But anyone who sells all or a material part of a business will receive consideration. And the term "in connection with a sale" implies a broader category of cases than just those in which an executive employee owns and disposes of an interest in a business being sold. *See In Connection with*, Merriam Webster, https://www.merriam-webster.com/dictionary/in%20connection%20with [https://perma.cc/B3SZ-PMSU] (meaning "in relation to (something)" or "for reasons that relate to (something)"); *see also Camp v. Williams*, 879 S.E.2d 88, 90 (Ga. 2022) (endorsing the use of dictionaries to construe undefined

statutory terms). Moreover, the GRCA's definition of seller separately accounts for "[a]n owner of a controlling" (25 percent) "interest." O.C.G.A. § 13-8-51(17)(A); *see also id.* § 13-8-51(4) (defining "controlling interest"). If the material part requirement modified the definition of seller, these two prongs of the definition would be largely redundant. We think the district court's approach renders this definition of "seller" superfluous to rescue the term "material part" from the same fate.[12]

---

[12] The district court rooted its approach largely in pre-GRCA Georgia common law, interpreting the differing presumptions in subsections (b) and (d) of O.C.G.A. § 13-8-57 as codifying the traditional distinction between covenants ancillary to the sale of a business and covenants ancillary to employment. Georgia courts would "divide restrictive covenants into covenants ancillary to an employment contract, which [would] receive strict scrutiny . . . and covenants ancillary to a sale of business, which [would] receive much less scrutiny." *BB&T Ins. Servs., Inc. v. Renno*, 864 S.E.2d 608, 613 (Ga. Ct. App. 2021) (internal quotation marks omitted). The district court relied on one case applying this distinction—*White v. Fletcher/Mayo/Assocs., Inc.*, 303 S.E.2d 746 (Ga. 1983)—to conclude that this agreement more closely resembled a covenant ancillary to employment.

Although Georgia common law is an appropriate source of law to draw upon where the statute is unclear, it cannot override the plain text of the statute. Only when the "statutory text can be as reasonably understood to conform to the common law" as to depart from it do we "presume that the legislature meant to adhere." *Loudermilk*, 826 S.E.2d at 121 n.4 (internal quotation marks omitted). But when "the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly." *Kemp v. Kemp*, 788 S.E.2d 517, 522 (Ga. Ct. App. 2016) (internal quotation marks omitted). Under the only reasonable construction of the statute, Baldwin meets the criteria for the application of the five-year presumption contained in O.C.G.A. § 13-8-57(d).

A different construction better harmonizes the statutory language. The term "all or a material part of" refers to the sale itself—not the executive employee's stake in it. Therefore, O.C.G.A. § 13-8-57(d) applies (as relevant here) to: an executive employee of the business who receives, at a minimum, consideration in connection with a sale of all or a material part of one of the five enumerated interests. Baldwin meets these criteria. As we have already explained, Baldwin is an executive employee who received significant consideration.[13] And the sale at issue was "of all or a material part of . . . [t]he assets of a business." *Id*. § 13-8-57(d)(1). Express purchased all of Fuller and Lamb's stores. Thus, the district court should have "presume[d]" the four-year duration of the covenant "to be reasonable in time." *Id*. § 13-8-57(d). Instead, applying O.C.G.A. § 13-8-57(b), it presumed the opposite.[14]

---

[13] The "at a minimum" language contained in O.C.G.A. § 13-8-51(17) suggests that not just any amount of consideration will suffice to qualify a key employee as a seller. But we need not confront that issue here. Baldwin received nearly $2 million. Under the circumstances, we find this amount more than adequate to satisfy the definition of seller.

[14] Section 13-8-57(b)—the two-year presumption—by its terms applies to agreements "not associated with the sale or ownership of all or a material part of" of a business. O.C.G.A. § 13-8-57(b). This language further supports our conclusion. The agreement between Baldwin and Express was certainly "associated with" the sale of the assets of Fuller and Lamb's businesses in the ordinary sense of the term; it related to the sale. *See Associated*, Merriam Webster, https://www.merriam-webster.com/dictionary/associated [https://perma.cc/JV6F-F6QV] (meaning "related, connected, or combined together").

By applying the wrong presumption in holding that Baldwin was likely to succeed on the merits of his claim, the district court abused its discretion. *Jysk*, 810 F.3d at 773–74. Accordingly, we vacate the preliminary injunction to the extent it altered the duration of the covenant agreement. We note, however, that the GRCA specifies that the presumptions contained in § 13-8-57 are "rebuttable." O.C.G.A. 13-8-57(a). We do not prejudge whether, on the facts of this case, Baldwin can rebut this presumption. On remand, applying § 13-8-57(d), the district court may consider in the first instance whether Baldwin is likely to rebut this presumption and thus succeed on the merits of his claim.

### iii.    Blue-Pencil Authority

Express argues that the district court lacked the authority to modify the covenant in the manner it did: altering those provisions it deemed unenforceable under the GRCA. According to Express, the district court "disregarded the intent and expectations of the parties," inventing new terms "from whole cloth" when it narrowed the covenant. Appellant's Br. at 22, 24 (internal quotation marks omitted). Because we have already concluded that the district court abused its discretion when it altered the covenant's duration, we consider this argument only in the context of Section 1's geographic scope.

We find no merit to Express's argument. The GRCA authorizes the enforcement of restrictive covenants that are "reasonable in . . . geographic area." O.C.G.A. § 13-8-53(a). When the geographic scope of a covenant is unreasonable, it is "not in

compliance with the [GRCA]" and thus "unlawful . . . void and unenforceable." *Id.* § 13-8-53(d). When faced with an unenforceable provision—like the overbroad non-competition area here—the GRCA authorizes a court to "modify the restraint provision and grant only the relief reasonably necessary to protect [legitimate business interests] and to achieve the original intent of the contracting parties to the extent possible." *Id.* § 13-8-54(b); *see also id.* § 13-8-53(d) (permitting a court to "modify a covenant that is otherwise void and unenforceable"). That is precisely what the district court did. As we have explained, the covenant agreement's geographic scope is unreasonable and unsupported by a legitimate business interest except within Baldwin's prior service area. The district court thus narrowed the geographic reach of the covenant to equal the most that would be enforceable under the GRCA.

Georgia common law bolsters our conclusion that the district court's blue-pencil authority authorized it to reduce the geographic scope of the covenant. Before the enactment of the GRCA, Georgia courts possessed the authority to blue-pencil restrictive covenants ancillary to the sale of a business. *See Watson v. Waffle House, Inc.*, 324 S.E.2d 175, 177 (Ga. 1985). And where such a covenant "designate[d] a [non-competition] area greater than reasonably necessary," courts could exercise that authority to "enjoin the seller from competing in only so much of that area as . . . is essential to protect the buyer." *Hamrick v. Kelley*, 392 S.E.2d 518, 518–19 (Ga. 1990) (internal quotation marks omitted); *see also Waste Mgmt. of Metro Atlanta v. Appalachian Waste Sys., LLC*, 649 S.E.2d 578, 582 (Ga. Ct. App. 2007) (explaining that when blue-penciling a court

may "limit an [existing] area, thus making it reasonable"(internal quotation marks omitted)). The common-law backdrop is consistent with the district court's revisions to the geographic scope of the agreement: it narrowed a defined non-competition area. *See* Doc. 30 at 37 ("The Court finds that this narrowed version of the agreement will sufficiently protect [Express's] legitimate business interest[.]"). The GRCA extended this same blue-pencil authority to all restrictive covenants. *See N. Am. Senior Benefits, LLC v. Wimmer,* 889 S.E.2d 361, 67 (Ga. Ct. App. 2023) (retaining *Hamrick's* common-law rule governing scope of blue-pencil authority under the GRCA).

Nor are we persuaded that the district court "disregarded the intent and expectations of the parties." Appellant's Br. at 22. Even if the district court could enforce an unreasonable covenant, *but see* O.C.G.A. §§ 13-8-53(d), 13-8-54(b), this covenant anticipated that the district court might narrow overbroad restrictions. Section 6 authorizes "any court called upon to enforce this Agreement . . . to modify the . . . geographic area established herein, to the extent such court determines is necessary . . . [for] this Agreement [to] be enforced." Doc. 1-1 at 52. Faced with unenforceable terms, the district court did as the parties intended.

### iv.    Remaining Preliminary Injunction Factors

Having concluded that Baldwin is likely to succeed on the merits of his claim that the geographic scope of the covenant agreement is unenforceable (and confirmed that that district court had the authority to narrow it), we consider the remaining factors

Baldwin must show to justify a preliminary injunction: "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Express (briefly) argues that the district court abused its discretion when it determined that Baldwin had made the requisite showing as to each of these three factors. We reject its arguments.

Addressing irreparable harm, the district court observed that "Baldwin is someone in his mid 50s . . . . He obviously wants to work. He is still productive. And to be thwarted from any productive employment in his field is an enormous loss." Doc. 30 at 35. Baldwin has already had to forgo at least one business opportunity because of the covenant—one that is no longer available, so the harm from his inability to pursue it has become irreparable. And the district court found no reason to conclude that "other opportunities will not come up in the future." *Id.*

Express has not explained how the district court committed a clear error in judgment by concluding that Baldwin is likely to suffer irreparable harm. It merely suggests Baldwin's agreement is reasonable, he received a significant payment, and he should abide by the agreement. These arguments have nothing to say about whether Baldwin will suffer harm. And we have already rejected the minor premise of one by concluding that the geographic scope of Section 1 is not reasonable under Georgia law.

The district court also addressed the balance of the equities at length. Although it acknowledged that by striking some

restrictions it would be granting Baldwin a windfall, the district court concluded that "Baldwin's interest in earning a living certainly outweighs any interest [Express] has in enforcing the broad nationwide protections contemplated in the restrictive covenant as written." *Id.* at 36. The district court determined that by using its blue-pencil authority to grant targeted relief to Baldwin, it would respect the balance of the equities.

Express has not shown otherwise. On appeal, it points only to the windfall it claims Baldwin will receive: "$2,250,000 and the ability to immediately compete with Appellant." Appellant's Br. at 29.[15] Any such windfall is significantly exaggerated. The roughly $2 million Baldwin received in connection with the sale of Fuller and Lamb's assets represented his stake in 138 Investments, Middle Georgia Investments, and Knoxville Express—it was not consideration solely for the covenant agreement. Although the district court found that the sale price included a premium for the restrictive covenants executed by Baldwin, Fuller, and Lamb, Baldwin "would have been entitled to a . . . share of the sale proceeds regardless." Doc. 30 at 20. And the district court did not strike the covenant agreement entirely. So any windfall Baldwin received is

---

[15] Express also refers to Baldwin's ability to "directly solicit" its "employees and customers." Appellant's Br. at 29. Express does not present any other argument regarding Section 2, the non-solicitation portion of the covenant agreement, which the district court's injunction did not address. We do not consider Section 2 in our analysis.

significantly less than the total sum he was paid in connection with the sale of Fuller and Lamb's assets.

The district court also offered another reason for its conclusion on the equities that we find persuasive. The district court concluded that it lacked the authority under Georgia law to require Baldwin to return some portion of the $2 million payment (a conclusion Express does not contest on appeal and we thus assume to be correct). Its options, then, were to (1) enforce the covenant; (2) strike down the covenant in its entirety, while allowing Baldwin to retain the $2 million; or (3) provide targeted relief while allowing Baldwin to retain the $2 million. *See Burbach*, 892 S.E.2d at 727 n.6 (observing that, under the GRCA, a trial court may have "discretion to decide whether to blue-pencil a restrictive covenant" but declining to address the scope of that discretion). The GRCA does not permit a court to enforce an unlawful covenant. O.C.G.A. §§ 13-8-53(d), 13-8-54(b). And targeted relief does more to preserve the parties' bargain than would indiscriminate relief. The district court did not abuse its discretion by determining that the balance of equities favored targeted preliminary injunctive relief in Baldwin's favor.

As to the final factor, Express argues that the district court abused its discretion in ruling that the public interest favored granting preliminary relief to Baldwin because it "contravened the public interest in upholding reasonable . . . restrictive covenants." Appellant's Br. at 30. The district court drew on essentially the same reasoning, concluding that the public interest did not support

"enforcing facially invalid contractual terms" that violate the GRCA. Doc. 30 at 44. It added that Baldwin is a skilled professional, and the public would be better served by having access to his services than by requiring him to idle. Because we agree with the district court that the geographic scope of the restrictions contained in the covenant agreement are contrary to Georgia law, we find Express's argument meritless.

In sum, the district court did not abuse its discretion when it decided that Baldwin made the showing necessary to warrant a preliminary injunction narrowing the geographic scope of the covenant. We therefore affirm this portion of the injunction.

### B. Injunction Bond

In addition to partly enjoining Express from enforcing the covenant, the district court ordered Baldwin to post a $40,000 injunction bond. On appeal, Express challenges the bond amount, calling it "patently low." Appellant's Br. at 30. Because we partly vacate the preliminary injunction, we do not decide Express's challenge to the bond amount. We leave it to the district court to determine the proper bond amount on remand based on whatever preliminary relief it ultimately awards to Baldwin.

### IV.    CONCLUSION

For the above reasons, we: (1) **DISMISS AS MOOT** Express's appeal insofar as it challenges the district court's injunction altering now-expired components of the covenant agreement, (2)

**VACATE in part** the district court's preliminary injunction insofar as it reduced the duration of the covenant agreement, and (3) **AFFIRM in part** the district court's preliminary injunction insofar as it reduced the live aspects of the non-competition area. On remand, the district court may consider whether Baldwin has rebutted the presumption contained in O.C.G.A. § 13-8-57(d) and may set an appropriate injunction bond.